# EXHIBIT A

## James Burrows

| | |
|---|---|
| **From:** | Chartering (Campbell Bulk) <Chartering@campbellbulk.com> |
| **Sent:** | 07 July 2023 19:15 |
| **To:** | PostFix Campbell Bulk |
| **Subject:** | ***NEW FIXTURE CLEAN RECAP *** MV CS SATIRA/GLOBAL AMERICAN TRANSPORT LLC (GAT)- CLEAN RECAP CP DTD. 07.07.2023 |
| **Attachments:** | CS SATIRA - BALTIC QUESTIONNAIRE Jan23.pdf; CARGO HOLD PICTURES.xlsx; CS Satira - XO - 09.06.2021 sign Chrts.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Veronica,

Kindly find the clean recap for CS Satira to perform 1TCT with bgd petcoke from Poti to China with delivery passing cannakale from the 17th of July.

Pls keep me posted if you have any questions on the below.
Rgrds,

Agathe
**From:** George Drakopoulos <ged@lightshipchartering.com>
**Date:** 7 Jul 2023, 12:49
**To:** Chartering <Chartering@campbellbulk.com>
**Subject:** MV CS SATIRA/GLOBAL AMERICAN TRANSPORT LLC (GAT)- CLEAN RECAP CP DTD. 07.07.2023

**Caution:** Do not click links or open attachments unless you recognize the sender.

```
AGATHE + JOSHUA / GIORGOS

CC: OPS, RENATA

===================================================================
============
REF MV CS SATIRA/GLOBAL AMERICAN TRANSPORT LLC (GAT)- CLEAN RECAP CP DTD.
07.07.2023
===================================================================
============

ATTACHED
    • CHARTS BG/FIXLIST
    • WARRANTIES/GUARANTEES QUESTIONNAIRE (TO BE PREPARED BY OWNERS) - SEND
    • GAT KYC FORM

CHARTS CLUB: THE LONDON CLUB

M/V CS SATIRA
    1. PLS PROVIDE FULL TCD ON ABT BASIS AND PLS DELETE WOG, INCLUDING
       FULL/ECO SPEED AND ON DECK CUBICS FOR LOG CARGOES (IF APPLICABLE)

MV 'CS SATIRA'
FLAG/BUILT/TYPE BAHAMAS/2013/BULK CARRIER/ LOGGER
CLASS ABS
```

1

DEADWEIGHT/DRAFT ABT 37,650MT/10.21 M SSW
LOA/BEAM/TPC 179.90 M/30.40 M/52.6M
INT. GR/NT 24793 / 12488
BOXY IN H- 2,3,4 CO2 FITTED / A60 BULKHEAD / AWWF HOLD LADDER FITTED
5HOLDS/HATCHES/END FOLDING HATCH COVERS
4X30.5 METRIC TONNES CRANES
CUBIC BREAKDOWN
GRAIN/BALE CU.M 46,431.50 CU MTRS 44,574.20 CU MTRS
  GRAIN/BALE CU.M - H1 7,497.20 7,197.30 CU MTRS
  GRAIN/BALE CU.M - H2 10,030.00 9,628.80 CU MTRS
  GRAIN/BALE CU.M - H3 10,030.00 9,628.80 CU MTRS
  GRAIN/BALE CU.M - H4 10,030.00 9,628.80 CU MTRS
  GRAIN/BALE CU.M - H5 8,844.30 8,490.50 CU MTRS


SPEED/CONS
ABT 12.7 KTS (L/B) ON ABT 19.5MT(L)/ ABT 17.1MT (B)


AN ADD. QTTY OF 0.2 MT MDO/DAY AS PER PRACTICE FOR FO CHANGE OVER,
GENERATOR STARTING, INCINERATOR, BOILER, ETC.
AT PORT CONDITION IDLE ABT 2.5 MT VLSFO AT PORT CONDITION WORKING
(24HRS) ABT 4.78 MT VLSFO
SPEED AND CONSUMPTION ARE GIVEN BASIS UP TO BEAUFORT 4, NO ADVERSE
CURRENT AND DOUGLAS SEA STATE 3. VESSEL HAS
LIBERTY TO USE MDO FOR MANOEUVRING IN NARROW WATERS, CANALS, RIVERS,
STARTING ENGINES AND ON ENTERING/LEAVING PORTS AND
ADVERSE WEATHER OR WHEN THE GENERATOR IS ON LOW LOAD. VESSEL ALSO HAS
LIBERTY TO USE MDO/MGO IN HER MAIN, AUXILIARY
ENGINES & BOILER WHEN REQUIRED BY LOCAL REGULATIONS. "ABT" TO BE -0.5KTS
FOR SPEED AND +5% FOR FUEL CONSUMPTION.


BUNKERS SUPPLIED TO BE IN ACCORDANCE WITH ISO SPECIFICATIONS: VLSFO: ISO
8217: 2005 ISO-F-RMG 380 MDO: ISO 8217:2005
ISO-F DMC SULPHUR CONTENT NOT EXCEEDING 1.5% STATUTORY LIMIT OUTSIDE ECA
FOR MAIN ENGINE, GENERATOR ENGINE AND BOILER.
LSGO: ISO 8217:2010 ISO-F DMA MAX. 0.1% SULPHUR CONTENT FOR MAIN ENGINE,
ENERATOR ENGINE AND BOILER WHILE IN ECA.
NO MIXING OF VLSFO BUNKERS ALLOWED BUT MIXING OF LSMGO BUNKERS
PERMITTED
ALL FIGURES OR DETS ABT


2. PLS PROVIDE BALTIC QUESTIONNAIRE – ATTACHED
3. PLS PROVIDE LAST 10 CARGOES AND LAST 10 PORTS: GRAIN (CURRENT
   ) ,SOYBEANS  , HRW/SRW – REVERTING ON LAST PORTS
4. PLS PROVIDE LATEST ITINERARY: ETC BEJAIA 10/11 JUL
5. PLS PROVIDE PHOTOS ON VESSEL HOLDS – ATTACHED
6. PLS PROVIDE RIGHTSHIP RATING AND GHG STATUS - OWNERS DONT HAVE RS
   NEED CHRTRS TO CHECK
7. PLS PROVIDE LAST DD/SS DATES – 26TH JAN 2019
8. PLS PROVIDE LAST PSC REPORT: PSC 3 DEFICIENCIES RECTIFIED AND CLOSED.
1. BEJAIA, ALGERIA (DISCHARGING WHEAT)
2. QUEBEC CITY, CANADA (LOADING WHEAT)
3. NORFOLK, USA (DISCHARGING SOYABEAN)

FOR
1) CHARTERERS:
GLOBAL AMERICAN TRANSPORT LLC
77 WEST WACKER DRIVE, 45 TH FLOOR
CHICAGO, ILLINOIS, 60601, USA
T:  +1 312 3129593 (24HRS)
E:   OPS@GATRANSPORTLLC.COM
W: WWW.GATRANSPORTLLC.COM

2) HEAD OWNERS, SHIP MANAGERS,D-OWNERS(IF ANY):

SATIRA SHIPPING COMPANY LIMITED
CAMPBELL MARITIME CENTRE, 1ST FLOOR, WEST BAY STREET
P.O. BOX N-7003, NASSAU


- CONTRACTUAL PARTY
CONTRACTUAL COUNTERPART TO BE SATIRA SHIPPING COMPANY LIMITED

- MANAGERS:
CAMPBELL BULK LIMITED
CAMPBELL MARITIME CENTRE, 1ST FLOOR, WEST BAY STREET
P.O. BOX N-7003, NASSAU

3) DELIVERY: PASSING CANAKALLE

4) LAY/CAN : 1200 HRS 17 JULY 2023 ,- 2359 HRS TO 20 JULY  2023, BASIS
LOCAL TIME.

5) PERIOD & TRADING:
FOR 1 TCT TRIP VIA POTI, GEROGIA TO RIZHAO CHINA DURATION ABT 45 DAYS WOG,
WITH LAWFUL, NON-DANGEROUS AND NON-HAZARDOUS CARGOES, INTENTION PETCOKE
IN BIG BAGS), ALWAYS VIA SP(S), SB(S), SA(S), SPLACE(S), STRANSIT(S),
ALWAYS AFLOAT (EXCEPT NAABSA PORTS),

6) REDELIVERY:
ON DLOSP RIZHAO CHINA

7) HIRE:
USD 9500, PDPR INCLOT PAYABLE EVERY 15 DAYS IN ADVANCE. 20 DAYS OF HIRE IN
FIRST HIRE PAYABLE WITHIN THREE BANKING DAYS AFTER VESSEL'S DELIVERYY AND
CHARTERERS' RECEIPT OF OWNERS' HIRE STATEMENT VIA E-MAIL.

OWNERS' BANKING DETAILS: TO BE GIVEN UPON CLEAN FIXING

8) BUNKERS CLS: PLS PROVIDE QUANTITIES
BUNKERS EXPECTED ON DELIVERY AS ON BOARD TO BE ABOUT 510-560 MTONS VLSFO
AND ABOUT 120-160 MTONS LSMGO. BUNKERS ON RE-DELIVERY TO BE ABOUT SAME
QUANTITIES AS ON DELIVERY. FOR THE PURPOSE OF SMALL ADJUSTMENTS ONLY,
CHARTERERS ON DELIVERY AND OWNERS ON RE-DELIVERY TO TAKE OVER BUNKERS
REMAINING ON BOARD AT THE SAME PRICES OF USD 600  .PMT VLSFO AND USD
720PMT LSMGO.

OWNER'S OPTION TO JOIN CHARTERER BUNKER STEM AT THEIR TIME AND ACCOUNT
PROVIDED SAME DOES TO INTERFERE WITH CHRS OPERATIONS AND CARGO INTAKE

9) ILOHC:
CHARTERERS TO PAY ON REDELIVERY A LUMPSUM OF USD 10.000.00 IN LIEU OF HOLD
CLEANING EXCLUDING REMOVAL AND DISPOSAL OF DUNNAGE, DEBRIS, LASHING
MATERIALS

10) CABLING/VICTUALLING:
CHARTERERS TO PAY USD 1,500.00 PER DELETE "30 DAYS" REPLACE "MONTH" OR
PRO RATA FOR VICTUALLING AND COMMUNICATIONS.

11) VSL'S HOLDS ON ARRIVAL FIRST LOAD PORT:
VESSEL ON ARRIVAL FIRST LOAD PORT TO BE READY TO RECEIVE PETCOKE IN BIG
BAGS TO INDEPENDENT SURVEYORS SATISFACTION.HER HOLDS/CARGO COMPARTMENTS
TO BE CLEAN, FRESH WATER WASHED, DRY, FREE OF LOOSE RUST AND CARGO
RESIDUES/STAINS READY IN ALL RESPECTS TO THE SATISFACTION OF THE
SURVEYOR. IF ON PRESENTATION FOR LOADING AT FIRST LOADING PORT/S THE
VESSEL SHOULD FAIL TO PASS THE INSPECTION, THEN VESSEL TO BE PUT OFFHIRE
FROM TIME OF FAILURE UNTIL MASTER CALLS FOR REINSPECTION AND DIRECTLY
AND PROVEN EXPENSES INCL. LABOUR STANDING BY (MAX 1ST SHIFT)TO BE FOR
OWNERS ACCOUNT. PRO RATA PRINCIPLE TO BE APPLICABLE IF LOADING
ACCORDINGLY ALLOWED.

CHARTERERS OPTION TO PERFORM WATER HOSE TESTING PRIOR LOADING BY
INDEPENDENT SURVEYOR ON THE HOLDS FOR WEATHER TIGHT INTEGRITY. SHOULD
VESSEL FAIL TO PASS WATER HOLDS' TESTING, OWNERS TO REPAIR HOLDS AS SOON
AS POSSIBLE AND RISK AND EXPENSE TO BE FOR OWNERS ACCOUNT, VESSEL TO BE
OFF-HIRE FROM THE TIME OF FAILURE UNTIL HOLDS ARE PASSED.- AS PER XO/CS
SATIRA CP

ACCEPTANCE OF THE VESSEL UPON DELIVERY DOES NOT IN ANY WAY WAIVE CHARTS
ROGHTS TO CLAIM DAMAGES AT A LATER DATE SHOULD THE VESSEL NOT DELIVER IN
RIGHT AND TRUE CONDITION TO LOAD ALL PERMISSIBLE CARGOES UNDER THE
CHARTER PARTY WHETHER LOADED AT THE FIRST OR SUBSEQUENT LOADING PORTS.-
AS PER XO/CS SATIRA CP

12) BILL OF LANDING AND LOI:
-AS PER CP

13) INTERCLUB AGREEMENT:
AS PER CP

14) WEATHER ROUTING:
AS PER CP

15) GMT TIME:
FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR DELY AND REDELY
SHALL BE ADJUSTED TO G.M.T.

16) QUARANTINE
NORMAL QUARANTINES TIME AND EXPENSES TO ENTER THE PORT TO BE FOR CHARTS
ACCOUNT, BUT ANY TIME OF DETENTION AND EXPENSES FOR QUARANTINE DUE TO
PESTILENCE/ILLNESS ETC OF MASTER/OFFICERS/CREW TO BE FOR OWNERS ACCOUNT.

17) GOVERNING LAW:
ENGLISH LAW, LONDON ARBITRATION TO BE APPLIED.

18) COMMISSIONS: ADDRESS COMMISSION OF 3.75% DUE TO CHARTERERS, 1.25
PAYABLE TO LIGHTSHIP CHARTERING FM OWNERS

19) SUBJECT TO FURTHER DETAILS/TERMS/CONDITIONS/, CARGO/TRADING
EXCLUSIONS  PLS PROVIDE OWNERS CP - SATIRA / XO CPDD 09.06.2021 ATTACHED

OTHERWISE AS PER OWERS CP IN ATTACHMENT EXCEPT BLW:

MB

LINE 528 PLS REPLACE 20 WITH 25

RIDERS

CL. 87 ADD: RUSSIA AND UKRAINE ALWAYS TO BE EXCLUDED UNDER THIS CHARTER
PARTY

CLS 63 ADD "SAME NOT TO BE APPLICABLE FOR COVID-19"

END.

" Thx for support and good collaboration from both parties. "


Best Regards,

Giorgos Drakopoulos

Lightship Chartering Athens

Tel : +30 2108089900
Mob : +30 6949066288
Skype: drakgeor@gmail.com
Email: ged@lightshipchartering.com


🖨 **Please consider the environment before printing this email**
**Disclaimer:** This email message is intended only for the addressee(s) and contains information that may be confidential. If you are not the intended recipient please notify the sender by reply email and delete this message. The use, disclosure or reproduction of the email by anyone other than the intended recipient(s) is prohibited. As the integrity and security of any email message cannot be guaranteed when transmitted over the Internet, Campbell accepts no liability for possible damages caused by malware.

ORIGINAL

  

# NYPE 2015

## TIME CHARTER

New York Produce Exchange Form©
November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th 1981; September 14th 1993; June 3rd, 2015.

| | |
|---|---|
| 1 | **THIS CHARTER PARTY**, made and concluded in **Hellerup, on 09th**. ~~this~~       day of **June 20 21** |
| 2 | Between **Messrs. SATIRA SHIPPING COMPANY LIMITED, CAMPBELL MARITIME CENTRE, 1ST FLOOR, WEST BAY STREET, P.O. BOX N-7003, NASSAU, NEW PROVIDENCE, BAHAMAS,** ~~of~~ |
| 3 | as *Registered Owners/~~*Disponent Owners/*Time Chartered Owners~~ (the "Owners") of the Vessel described below |
| 4 | *delete as applicable |
| 5 | Name: **M.V. "CS SATIRA"** |
| 6 | ~~IMO Number:~~ |
| 7 | ~~Flag:~~ |
| 8 | ~~Built (year):~~ |
| 9 | ~~Deadweight All Told:~~      ~~metric tons~~ |
| 10 | (For Vessel's charter party description see ~~Appendix A~~ (Vessel Description)), (See Clause 58) |
| 11 | and **Messrs. XO SHIPPING A/S, TUBORG HAVNEVEJ 18, DK-2900 HELLERUP, DENMARK, as** Charterers ~~of~~     (the "Charterers") |

| | |
|---|---|
| 12 13 14 15 | This Charter Party shall be performed subject to all the terms and conditions herein consisting of this main body including any additional clauses and addenda, if applicable, ~~as well as Appendix A attached~~ hereto. In the event of any conflict of conditions, the provisions of any additional clauses and Appendix A shall prevail over those of the main body to the extent of such conflict, but no further. |

| | | |
|---|---|---|
| 16 | **1.** | **Duration/Trip Description** |
| 17 18 | (a) | The Owners agree to let, and the Charterers agree to hire, the Vessel from the time of delivery, for **time charter period of minimum 3 months to about 5 months in Charterers' option (about meaning +/- 15 days),** within below mentioned trading limits. |
| 19 20 | (b) | Trading Limits - The Vessel shall be employed in such lawful trades between safe ports and safe places within the following trading limits **See Clause 87**. as the Charterers shall direct. |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

CHECKED
BY DIABOS

ORIGINAL
**NYPE 2015 TIME CHARTER**

| 21 | (c) | Berths - The Vessel shall be loaded and discharged in any safe anchorage or at any safe berth or safe place |
| 22 | | that the Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always |
| 23 | | afloat. |

| 24 | (d) | The Vessel during loading and/or discharging may lie safely aground at any safe berth or safe place where it |
| 25 | | is customary for vessels of similar size, construction and type to lie at the following areas/ports **Argentina** |
| 26 | | **including River Plate, Buenaventura, south Brazil (not north of Vitoria) and strictly excluding Amazon River.** |
| 27 | | (if this space is left blank then this sub-clause 1(d) shall not apply), if so requested by the Charterers, provided |
| 28 | | it can do so without suffering damage. |
| 29 | | |
| 30 | | The Charterers shall indemnify the Owners for any loss, damage, costs, expenses or loss of time, including |
| 31 | | any underwater inspection required by class, caused as a consequence of the Vessel lying aground at the |
| 32 | | Charterers' request. |

| 33 | (e) | Sublet - The Charterers shall have the liberty to sublet the Vessel for all or any part of the time covered by |
| 34 | | this Charter Party, but the Charterers remain responsible for the fulfillment of this Charter Party. |

| 35 | **2.** | **Delivery** |

| 36 | (a) | The Vessel shall be delivered to the Charterers ~~at~~ **on dropping last outward sea pilot South West Pass, USA** |
| 37 | | **at any time day or night Sundays and Holidays included** (state port or place). |

| 38 | (b) | The Vessel on delivery shall be seaworthy and in every way fit to be employed for the intended service, having |
| 39 | | water ballast and with sufficient power to operate all cargo handling gear simultaneously, and, with full |
| 40 | | complement of Master, officers and ratings who meet the Standards for Training, Certification and |
| 41 | | Watchkeeping for Seafarers (STCW) requirements for a vessel of her tonnage. |

| 42 | (c) | The Vessel's holds shall be clean, dry, odourless, and free of loose rust/ rust scale and in all respects ready to |
| 43 | | receive the intended cargo to be loaded to the satisfaction of Charterers/ Shippers surveyor. , or if no |
| 44 | | intended cargo, any permissible cargo: |

| 45 | | (i) On *delivery; or |

| 46 | | (ii) On *arrival at first loading port if different from place of delivery. If the Vessel fails hold inspection then |
| 47 | | the Vessel shall be off-hire from the time of rejection until the Vessel has passed a subsequent inspection. |
| 48 | | first load port under this Charter Party, vessel to be clean and ready in all respect in all compartments to |
| 49 | | load Charterers cargo in accordance with relevant local independent surveyor's satisfaction. |
| 50 | | Should the vessel fail such inspection the owners shall take immediate corrective steps and expedite cleaning |
| 51 | | as quickly as possible. |
| 52 | | In case of a failure of inspection, the vessel will be off hire, from time of failing until re-inspected and passed. |
| 53 | | Any directly related and proven costs and expenses, including bunkers consumed will be for Owners' account. |
| 54 | | |
| 55 | | |
| 56 | | |
| 57 | | |
| 58 | | |
| 59 | | |

| 60 | | *(c)(i) and (c)(ii) are alternatives; delete as appropriate. If no deletion then Sub-clause (c)(i) shall apply. |

| 61 | (d) | The Owners shall keep the Charterers informed of the Vessel's itinerary. Prior to the arrival of the Vessel at |
| 62 | | the delivery port or place, the Owners shall serve the Charterers with **1st notice of delivery upon clean fixing** |
| | | **followed by daily notices.** ~~days' approximate and~~ |
| 63 | | ~~days' definite notices of the Vessel's delivery~~. Following the tender of any such notice the Owners shall give |
| 64 | | or allow to be given to the Vessel only such further employment orders, if any, as are reasonably expected |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

| | | |
|---|---|---|
| 65 | | when given to allow delivery to occur on or before the date notified. The Owners shall give the Charterers |
| 66 | | and/or their local agents notice of delivery when the Vessel is in a position to come on hire. |

| | | |
|---|---|---|
| 67 | | Vessel itinerary prior to delivery:          . |

| | | |
|---|---|---|
| 68 | (e) | Acceptance of delivery of the Vessel by the Charterers shall not prejudice their rights against the Owners |
| 69 | | under this Charter Party. |

| | | |
|---|---|---|
| 70 | **3.** | **Laydays/Cancelling** |

| | | |
|---|---|---|
| 71 | | If required by the Charterers, time on hire shall not commence before **00:01 hours – 15th June 2021** (local time) and |
| 72 | | should the Vessel not have **given written notice of readiness** ~~been delivered~~ on or before **23:59 hours – 22nd June 2021** (local time) at the port or place |
| 73 | | stated in Sub-clause 2(a), the Charterers **or their agents to** ~~shall~~ have the option of cancelling this Charter Party at any time ~~but~~ |
| 74 | | not later than the day of the Vessel's **readiness** ~~notice of delivery~~. |

| | | |
|---|---|---|
| 75 | **4.** | **Redelivery** |

| | | |
|---|---|---|
| 76 | (a) | The Vessel shall be redelivered to the Owners in like good order and condition, ordinary wear and tear |
| 77 | | excepted, ~~at~~ **on dropping last outward sea pilot or passing one safe port within following ranges at any** |
| 78 | | **time day or night Sundays and Holidays included, Skaw-Capetown range including UK – Ireland/ Continent/** |
| 79 | | **Baltic/ West Africa/ Full Mediterranean including Adriatic/ Black Sea, redelivery in Adriatic to be on passing** |
| 80 | | **Otranto SB St. Lawrence – Bahia Blanca range including US East Coast/ US Gulf/ Caribbean/ North Coast South** **America** (state port or place) |

| | | |
|---|---|---|
| 81 | (b) | The Charterers shall keep the Owners informed of the Vessel's itinerary. Prior to the arrival of the Vessel at |
| 82 | | the redelivery port or place, the Charterers shall serve the Owners with **15/ 10/ 7 /5** days' |
| 83 | | approximate and **3/ 2/ 1** days' definite notices <u>with actual port and date</u> of the Vessel's redelivery. |
| 84 | | Following the tender of any such notices the Charterers shall give or allow to be given to the Vessel only such |
| 85 | | further employment orders, if any, as are reasonably expected when given to allow redelivery to occur on or |
| 86 | | before the date notified. |

| | | |
|---|---|---|
| 87 | (c) | Acceptance of redelivery of the Vessel by the Owners shall not prejudice their rights against the Charterers |
| 88 | | under this Charter Party. |

| | | |
|---|---|---|
| 89 | **5.** | **On/Off-Hire Survey** |

| | | |
|---|---|---|
| 90 | | Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their |
| 91 | | respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct |
| 92 | | joint on-hire/off-hire surveys, for the purpose of ascertaining the quantity of bunkers on board and the |
| 93 | | condition of the Vessel. ~~A single report shall be prepared on each occasion and signed by each surveyor,~~ |
| 94 | | ~~without prejudice to his right to file a separate report setting forth items upon which the surveyors cannot~~ |
| 95 | | ~~agree.~~ |

| | | |
|---|---|---|
| 96 | | ~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~ |
| 97 | | ~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~ |

| | | |
|---|---|---|
| 98 | | Any time lost as a result of the on-hire survey shall be for the Owners' account and any time lost as a result |
| 99 | | of the off-hire survey shall be for the Charterers' account. |

| | | |
|---|---|---|
| 100 | | <u>A mutually agreed bunker survey is to be held by an independent bunker and/ or condition surveyor at the</u> |
| 101 | | <u>delivery and redelivery port, cost of it to be shared 50/ 50 unless Master/ Chief Engineer attends on Owners'</u> |
| 102 | | <u>behalf in which case expenses to be for Charterers' account. Such surveys not to be compulsory in case</u> |
| 103 | | <u>Charterers satisfy themselves with bunkers figures as given by Master/ Chief Engineer.</u> |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL
**NYPE 2015 TIME CHARTER**

| 104 | **6.** | **Owners to Provide** |

105 (a) The Owners shall provide and pay for the insurances of the Vessel, except as otherwise provided, and for all
106 provisions, cabin, deck, engine-room and other necessary stores, boiler water and lubricating oil; shall pay
107 for wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the
108 crew/crew visas; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull,
109 machinery and equipment for and during the service, and have a full complement of Master, officers and
110 ratings. Vessel shall have necessary equipment/ certificates for standard international requirements. In case
111 of any additional requirement for some specific port, Charterers shall provide it at their time and costs.

112 (b) The Owners shall provide any documentation relating to the Vessel as required to permit the Vessel to trade
113 within the agreed limits, including but not limited to International Tonnage Certificate, Suez and Panama
114 tonnage certificates, Certificates of Registry, and certificates relating to the strength, safety and/or
115 serviceability of the Vessel's gear. Such documentation shall be maintained during the currency of the Charter
116 Party as necessary.

117 Owners shall also provide and maintain such Certificates of Financial Responsibility for oil pollution to permit
118 the Vessel to trade within the agreed limits as may be required at the commencement of the Charter Party.
119 However, in the event that, at the time of renewal, a Certificate of Financial Responsibility is unavailable in
120 the market place, or, the premium for same increases significantly over the course of the Charter Party, then
121 Owners and Charterers shall discuss each with the other to find a mutually agreeable solution for same, failing
122 such solution the port(s) that require said Certificate of Financial Responsibility are to be considered as added
123 to the Vessel's trading exclusions. (See also Clause 18 (Pollution)).

124 (c) The Vessel to work night and day if required by the Charterers, with crew opening and closing hatches, when
125 and where required and permitted by shore labor regulations, otherwise shore labor for same shall be for
126 the Charterers' account.

| 127 | **7.** | **Charterers to Provide** |

128 (a) The Charterers, while the Vessel is on-hire, shall provide and pay for all the bunkers except as otherwise
129 agreed; shall pay for port charges (including compulsory garbage disposal), compulsory gangway watchmen
130 and cargo watchmen, compulsory and/or customary pilotages, canal dues, towages, agencies, commissions,
131 consular charges (except those pertaining to individual crew members or flag of the Vessel), and all other
132 usual expenses except those stated in Clause 6, but when the Vessel puts into a port for causes for which the
133 Vessel is responsible (other than by stress of weather), then all such charges incurred shall be paid by the
134 Owners.

135 (b) Fumigations ordered because of illness of the crew or for infestations prior to delivery under this Charter
136 Party shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while
137 the Vessel is employed under this Charter Party shall be for the Charterers' account.

138 (c) The Charterers shall provide and pay for necessary dunnage, lashing materials and also any extra fittings
139 requisite for a special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already
140 aboard the Vessel and Charterers to replenish the same or reimburse the owners for the cost accordingly.
141 Prior to redelivery the Charterers shall remove their dunnage, fittings and lashing materials at their cost and
142 in their time.

143 Any special treatment of ballast water as may be required by any government or other official sources, such
144 as chlorination, have to be arranged and paid for by the Charterers.

| 145 | **8.** | **Performance of Voyages** |

146 (a) Subject to Clause 38 (Slow Steaming) the Master shall perform the voyages with due despatch and shall
147 render all customary assistance with the Vessel's crew. The Master shall be conversant with the English

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

| | | |
|---|---|---|
| 148 | | language and (although appointed by the Owners) shall be under the orders and directions of the Charterers |
| 149 | | as regards employment and agency; and the Charterers shall perform all cargo handling, including but not |
| 150 | | limited to loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at |
| 151 | | their risk and expense, under the supervision of the Master. |
| 152 | (b) | If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or officers, |
| 153 | | the Owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a |
| 154 | | change in appointments. |

**155   9.   Bunkers**

156   (a)   Bunker quantities and prices

157   *(i) The Charterers on delivery, and the Owners on redelivery or any termination of this Charter Party, shall
158   take over and pay for all bunkers remaining on board the Vessel as hereunder. The Vessel's bunker tank
159   capacities shall be at the Charterers' disposal. ~~Bunker quantities and prices on delivery /redelivery to be~~
**160   Bunkers on delivery 700 metric tons VLSIFO and 60 metric tons LSMGO.**
**161   Charterers to pay for the value of bunkers along with the first hire statement and redeliver with about**
**162   same as on delivery.**
**163   Charterers can deduct the value of bunkers from the last sufficient hire payment, provided the hire is paid**
**164   till the minimum duration basis the most updated information available from the agents at the last**
**165   discharge port.**
**166   Owners have the option to bunker the vessel provided the same does not interfere with the Charterers**
**167   operations including but not limited to quantity of cargo, and other commitments.**
**168   Any minor differences to be settled at agreed prices together with last hire payment.**
**169   VLSIFO: USD 530 per metric ton and LSMGO: USD 600 per metric ton both ends.**

170   *(ii) The Owners shall provide sufficient bunkers onboard to perform the entire time charter trip. The
171   Charterers shall not bunker the Vessel, and shall pay with the first hire payment for the mutually agreed
172   estimated bunker consumption for the trip, namely          metric tons at          (price). Upon redelivery any
173   difference between estimated and actual consumption shall be paid by the Charterers or refunded by the
174   Owners as the case may be.

175   *(iii) The Charterers shall not take over and pay for bunkers Remaining On Board at delivery but shall redeliver
176   the Vessel with about the same quantities and grades of bunkers as on delivery. Any difference between the
177   delivery quantity and the redelivery quantity shall be paid by the Charterers or the Owners as the case may
178   be. The price of the bunkers shall be the net contract price paid by the receiving party, as evidenced by
179   suppliers' invoice or other supporting documents.

180   *(i), (ii) and (iii) are alternatives; delete as applicable. If neither Sub-clause (i), (ii) nor (iii) is deleted then Sub-
181   clause (i) shall apply.

182   Fuel to be supplied in conformity with MARPOL 73/78 Annex VI regulations 14 and 18.

183   Owners to be allowed to bunker the Vessel at load or discharge port without hindering Charterers' operations
184   and DWCC intake as agreed.

185   (b)   Bunkering Prior to Delivery/Redelivery

186   Provided that it can be accomplished at ports of call, without hindrance to the working or operation of or
187   delay to the Vessel, and subject to prior consent, which shall not be unreasonably withheld, the Owners shall
188   allow the Charterers to bunker for their account prior to delivery and the Charterers shall allow the Owners
189   to bunker for their account prior to redelivery. If consent is given, the party ordering the bunkering shall
190   indemnify the other party for any delays, losses, costs and expenses arising therefrom.

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

<p style="text-align:center">ORIGINAL</p>

**NYPE 2015 TIME CHARTER**

191    (c)    Bunkering Operations and Sampling

192    (i) The Chief Engineer shall co-operate with the Charterers' bunkering agents and fuel suppliers during
193    bunkering. Such cooperation shall include connecting/disconnecting hoses to the Vessel's bunker manifold,
194    attending sampling, reading gauges or meters or taking soundings, before, during and/or after delivery of
195    fuels.

196    (ii) During bunkering a primary sample of each grade of fuels shall be drawn in accordance with the
197    International Maritime Organization (IMO) Resolution Marine Environment Protection Committee (MEPC)
198    MEPC.182(59) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with the Marine
199    Pollution Convention (MARPOL) 73/78 Annex VI or any subsequent amendments thereof. Each primary
200    sample shall be divided into no fewer than five (5) samples; one sample of each grade of fuel shall be retained
201    on board for MARPOL purposes and the remaining samples of each grade distributed between the Owners,
202    the Charterers and the bunker suppliers.

203    (iii) The Charterers warrant that any bunker suppliers used by them to bunker the Vessel shall comply with
204    the provisions of Sub-clause (c)(ii) above.

205    (iv) Bunkers of different grades, specifications and/or suppliers shall be segregated into separate tanks within
206    the Vessel's natural segregation. The Owners shall not be held liable for any restriction in bunker capacity as
207    a result of segregating bunkers as aforementioned.

208    (d)    Bunker Quality and Liability

209    (i) The Charterers shall supply bunkers of the agreed specifications and grades:        The bunkers shall be of
210    a stable and homogeneous nature and suitable for burning in the Vessel's engines and/or auxiliaries and,
211    unless otherwise agreed in writing, shall comply with the International Organization for Standardization (ISO)
212    standard 8217:2012 or any subsequent amendments thereof. If ISO 8217:2012 is not available then the
213    Charterers shall supply bunkers which comply with the latest ISO 8217 standard available at the port or place
214    of bunkering.

215    (ii) The Charterers shall be liable for any loss or damage to the Owners or the Vessel caused by the supply of
216    unsuitable fuels and/or fuels which do not comply with the specifications and/or grades set out in Sub-clause
217    (d)(i) above, including the off-loading of unsuitable fuels and the supply of fresh fuels to the Vessel. The
218    Owners shall not be held liable for any reduction in the Vessel's speed performance and/or increased bunker
219    consumption nor for any time lost and any other consequences arising as a result of such supply.

220    (e)    Fuel Testing Program

221    Should the Owners participate in a recognized fuel testing program one of the samples retained by the
222    Owners shall be forwarded for such testing. The cost of same shall be borne by the Owners and if the results
223    of the testing show the fuel not to be in compliance with ISO 8217:2012, or any subsequent amendment
224    thereof, or such other specification as may be agreed, the Owners shall notify the Charterers and provide a
225    copy of the report as soon as reasonably possible.

226    In the event the Charterers call into question the results of the testing, a fuel sample drawn in accordance
227    with IMO Resolution MEPC.96(47) Guidelines for the Sampling of Fuel Oil for Determination of Compliance
228    with Annex VI of MARPOL 73/78 or any subsequent amendments thereof, shall be sent to a mutually agreed,
229    qualified and independent laboratory whose analysis as regards the characteristics of the fuel shall be final
230    and binding on the parties concerning the characteristics tested for. If the fuel sample is found not to be in
231    compliance with the specification as agreed in the paragraph above, the Charterers shall meet the cost of
232    this analysis, otherwise same shall be for the Owners' account.

233    (f)    Bunker Fuel Sulphur Content

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

234     (i) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such
235     specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content
236     requirements of any emission control area when the Vessel is ordered to trade within that area.

237     The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by
238     the Charterers to supply such bunkers shall comply with Regulations 14 and 18 of MARPOL Annex VI,
239     including the Guidelines in respect of sampling and the provision of bunker delivery notes.

240     The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay,
241     fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (f)(i).

242     (ii) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in
243     accordance with Sub-clause (f)(i), the Owners warrant that:

244     1.     the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements
245         of any emission control area; and
246     2.     the Vessel shall be able to consume fuels of the required sulphur content,

247     when ordered by the Charterers to trade within any such area.

248     Subject to having supplied the Vessel with fuels in accordance with Sub-clause (f)(i), the Charterers shall not
249     otherwise bear any loss, liability, delay, fines, costs or expenses arising or resulting from the Vessel's failure
250     to comply with Regulations 14 and 18 of MARPOL Annex VI.

251     (iii) For the purpose of this Clause, "emission control area" shall mean an area as stipulated in MARPOL Annex
252     VI and/or an area regulated by regional and/or national authorities such as, but not limited to, the European
253     Union (EU) and the United States (US) Environmental Protection Agency.

254   (g)   Grades and Quantities of Bunkers on Redelivery

255     Unless agreed otherwise, the Vessel shall be redelivered with the same grades and about the same quantities
256     of bunkers as on delivery; however, the grades and quantities of bunkers on redelivery shall always be
257     appropriate and sufficient to allow the Vessel to reach safely the nearest port at which fuels of the required
258     types are available.

**259   10.   Rate of Hire; Hold Cleaning; Communications; Victualing and Expenses**

**260**   (a)   The Charterers shall pay for the use and hire of the said Vessel at the rate of **USD 24,000 (Twenty Four**
261     **Thousand United States Dollars)**. per day or pro rata for any part of a day, commencing on and from the time of her
262     delivery, as aforesaid, including the overtime of crew; hire to continue until the time of her redelivery to the
263     Owners as per Clause 4 (Redelivery) (unless Vessel lost).

264     Unless otherwise mutually agreed, the Charterers shall have the option to redeliver the Vessel with
265     unclean/unswept holds against a lumpsum payment of **See Clause 60** in
266     lieu of hold cleaning, to the Owners (unless Vessel lost).
267

268     The Owners shall victual pilots and such other persons as authorized by the Charterers or their agents. While
**269**     on-hire, the Charterers shall pay the Owners along with the hire payments, **USD 1,500 (One Thousand Five**
270     **Hundred United States Dollars)** per **month** ~~thirty (30) days~~ or pro rata, to cover all Communications, Victualing and
271     Expenses properly incurred by the Vessel under the Charterers' employment.

272     ~~For the purpose of hire calculations, the times of delivery, redelivery or termination of this Charter Party shall~~
273     ~~be adjusted to Coordinated Universal Time (UTC)~~. **Local time to apply for delivery time and GMT for hire calculations.**

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

274   (b)   Hold Cleaning/Residue Disposal

275       (i) The Charterers may request the Owners to direct the crew to sweep and/or wash and/or clean the holds
276       between voyages and/or between cargoes against payment at the rate of **USD 1,000 per hold/ per occasion**
277       **except after bagged or bulk cement/ scrap/ clinker/ petcoke/ salt/ sulphur/ limestone when USD 1,500**
278       **per hold to apply** ~~per hold~~, provided the crew is able safely to undertake such work and is allowed to do  so
279       by local regulations. In connection with any such operation the Owners shall not be responsible if the Vessel's
280       holds are not accepted or passed. Time for cleaning shall be for the Charterers' account.

281       (ii) Unless this Charter Party is concluded for a single laden leg, all cleaning agents, equipment and/ or
282       materials, including fresh water for hold fresh water washing required for the purpose of the intermediate
283       hold cleaning if so requested and additives (including chemicals and detergents) required for cleaning cargo
284       holds shall be supplied and paid for by the Charterers. The Charterers shall provide the Owners with a dated
285       and signed statement identifying cleaning agents and additives that, in accordance with IMO Resolution
286       219(63) Guidelines for the Implementation of MARPOL Annex V, are not substances harmful to the marine
287       environment and do not contain any component known to be carcinogenic, mutagenic or reprotoxic.

288       (iii) Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible
289       for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related
290       residues and/or hold washing water and/or cleaning agents and detergents and/or waste. Removal and
291       disposal as aforesaid shall always be in accordance with and as defined by MARPOL Annex V, or other
292       applicable rules.

293  **11.**   **Hire Payment**

294   (a)   Payment

295       Payment of Hire shall be made without deductions due to Charterers' bank charges so as to be received by
296       the Owners or their designated payee into the bank account as follows
297       **USD Account**
298       **Correspondent bank :**
299       **Swift :**
300       **Beneficiary Bank :**
301       **Beneficiary Name :**
302       **Beneficiary account :**
303
304       in the currency stated in Clause 10 (Rate of Hire; Hold Cleaning; Communications; Victualing and Expenses),
305       in funds available to the Owners on the due date. Charterers to pay first 15 days hire and value of bunkers
306       on delivery within 3 banking days of delivery, fifteen (15) days in advance, and for the last fifteen (15) days
307       or part of same the approximate amount of hire, and should the same not cover the actual time, hire shall
308       be paid for the balance day by day as it becomes due, if so required by the Owners. The first payment of
309       hire shall be due on delivery.

310   (b)   Grace Period

311       Where there is failure to make punctual payment of hire due, the Charterers shall be given by the Owners
312       three (3) Banking Days (as recognized at the agreed place of payment and the place of currency of the Charter
313       Party) written notice to rectify the failure, and when so rectified within those three (3) Banking Days following
314       the Owners' notice, the payment shall stand as punctual.

315   (c)   Withdrawal

316       Failure by the Charterers to pay hire due in full within three (3) Banking Days of their receiving a notice from
317       Owners under Sub-clause 11(b) above shall entitle the Owners, without prejudice to any other rights or claims
318       the Owners may have against the Charterers:

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO
SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes
are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

| | | |
|---|---|---|
| 319 | | (i) to withdraw the Vessel from the service of the Charterers; |
| 320 | | (ii) to damages, if they withdraw the Vessel, for the loss of the remainder of the Charter Party. |
| 321 | (d) | Suspension |

322 At any time while hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be
323 entitled to withhold the performance of any and all obligations hereunder and shall have no responsibility
324 whatsoever for any consequences thereof, and Charterers hereby indemnify the Owners for all legitimate
325 and justifiable actions taken to secure their interests, and hire shall continue to accrue and any extra
326 expenses resulting from such withholding shall be for the Charterers' account.

327 (e) Last Hire Payment

328 Should the Vessel be on her voyage towards port/place of redelivery at the time the last payment(s) of hire
329 is/are due, said payment(s) is/are to be made for such length of time as the estimated time necessary to
330 complete the voyage, including the deduction of estimated disbursements for the Owners' account before
331 redelivery. Should said payments not cover the actual time, hire is to be paid for the balance, day by day, as
332 it becomes due.

333 Unless Sub-clause 9(a)(ii) or (iii) has been agreed, the Charterers shall have the right to deduct the value of
334 bunkers on redelivery from last sufficient hire payment(s).

335 When the Vessel has been redelivered, any difference in hire and bunkers is to be refunded by the Owners
336 or paid by the Charterers within five (5) Banking Days, as the case may be.

337 At last port before redelivery, Vessel shall not be required to berth in case hire is not paid upto best estimated
338 redelivery, regardless of any grace period. Any time lost and/ or additional port expenses shall be for
339 Charterers' account.

340 (f) Cash Advances

341 Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required by
342 the Owners, subject to ~~two and a half (2.5)~~ one and a quarter (1.25) per cent commission (but never less than
343 actual remittance costs) and such advances shall be deducted from the hire. The Charterers, however, shall
344 in no way be responsible for the application of such advances.

345 **12.** **Speed and Consumption**

346 (a) Upon delivery and throughout the duration of this Charter Party the Vessel shall be capable of speed and
347 daily consumption rates as stated in Appendix A in good weather on all sea passages with wind up to and
348 including Force four (4) as per the Beaufort Scale and sea state up to and including Sea State three (3) as per
349 the Douglas Sea Scale (unless otherwise specified in Appendix A) and no adverse currents. Any period during
350 which the Vessel's speed is deliberately reduced to comply with the Charterers' orders/requirements (unless
351 slow steaming or eco speed warranties have been given in Appendix A) or for reasons of safety or while
352 navigating within narrow or restricted waters or when assisting a vessel in distress or when saving or
353 attempting to save life or property at sea, shall be excluded from performance calculations.

354 (b) The Charterers shall have the option of using their preferred weather routing service. The Master shall
355 comply with the reporting procedure of the Charterers' weather routing service and shall follow routing
356 recommendations from that service provided that the safety of the Vessel and/or cargo is not compromised.

357 (c) The actual route taken by the Vessel shall be used as the basis of any calculation of the Vessel's performance.

358 (d) If the speed of the Vessel is reduced and/or fuel oil consumption increased, the Charterers may submit to

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL
**NYPE 2015 TIME CHARTER**

359      the Owners a documented claim limited to the estimated time lost and/or the additional fuel consumed,
360      supported by a performance analysis from the weather routing service established in accordance with this
361      Clause. The cost of any time lost shall be off-set against the cost of any fuel saved and vice versa.

362    (e)    In the event that the Owners contest such claim then the Owners shall provide copies of the Vessel's deck
363      logs for the period concerned and the matter shall be referred to an independent expert or alternative
364      weather service selected by mutual agreement, whose report shall take Vessel's log data and the Charterers'
365      weather service data into consideration and whose determination shall be final and binding on the parties.
366      The cost of such expert report shall be shared equally.

367   **13.**    **Spaces Available**

368    (a)    The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can reasonably and
369      safely stow and carry), also accommodation for supercargo, if carried, shall be at the Charterers' disposal,
370      reserving only proper and sufficient space for the Vessel's Master, officers, ratings, tackle, apparel, furniture,
371      provisions, stores and bunkers.

372    (b)    In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the Charterers
373      for any loss and/or damage and/or liability of whatsoever nature howsoever caused to the deck cargo which
374      would not have arisen had the deck cargo not been loaded. Bills of Lading shall be issued as per Clause 31(c).

375   **14.**    **Supercargo**

376      The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers' risk
377      and see that voyages are performed with due despatch. He is to be furnished with free accommodation and
378      meals same as provided for the Master's table. The Charterers and the supercargo are required to sign the
379      standard letter of waiver and indemnity recommended by the Vessel's Protection and Indemnity Association
380      before the supercargo comes on board the Vessel.

381   **15.**    **Sailing Orders and Logs**

382      The Charterers shall furnish the Master from time to time with all requisite instructions and sailing directions,
383      in writing, in the English language, and the Master shall keep full and correct deck and engine logs of the
384      voyage or voyages, which are to be patent to the Charterers or their agents, and shall furnish the Charterers,
385      their agents or supercargo, when required, with a true copy of such deck and engine logs, showing the course
386      of the Vessel, distance run and the consumption of bunkers. Any log extracts required by the Charterers shall
387      be in the English language.

388   **16.**    **Cargo Exclusions**

389      The Vessel shall be employed in carrying lawful cargo, to be always loaded in accordance with I.M.O. and/ or
390      local regulations, merchandise, excluding:

391      BIMCO Solid Bulk Cargoes that Can Liquefy Clause for Charter Parties

392      (a) The Charterers shall ensure that all solid bulk cargoes to be carried under this Charter Party are presented
393      for carriage and loaded always in compliance with applicable international regulations, including the
394      International Maritime Solid Bulk Cargoes (IMSBC) Code 2009 (as may be amended from time to time and
395      including any recommendations approved and agreed by the IMO).

396      (b) If the cargo is a solid bulk cargo that may liquefy, the Charterers shall prior to the commencement of
397      loading provide the ship's Master, or his representative, with all information and documentation in
398      accordance with the IMSBC Code, including but not limited to a certificate of the Transportable Moisture
399      Limit (TML), and a certificate or declaration of the moisture content, both signed by the shipper.

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL
**NYPE 2015 TIME CHARTER**

400 (c) The Owners shall have the right to take samples of cargo prior to loading and, at Charterers' request,
401 samples to be taken jointly, testing of such cargo samples shall be conducted jointly between Charterers and
402 Owners by an independent laboratory that is to be nominated by Owners. Sampling and testing shall be at
403 the Charterers' risk, cost, expense and time. The Master or Owners' representative shall at all times be
404 permitted unrestricted and unimpeded access to cargo for sampling and testing purposes.

405 If the Master, in his sole discretion using reasonable judgement, considers there is a risk arising out of or in
406 connection with the cargo (including but not limited to the risk of liquefaction) which could jeopardise the
407 safety of the crew, the Vessel or the cargo on the voyage, he shall have the right to refuse to accept the cargo
408 or, if already loaded, refuse to sail from the loading port or place. The Master shall have the right to require
409 the Charterers to make safe the cargo prior to loading or, if already loaded, to offload the cargo and replace
410 it with a cargo acceptable to the Master, all at the Charterers' risk, cost, expense and time. The exercise by
411 the Master of the aforesaid rights shall not be a breach of this Charter Party.

412 (d) Notwithstanding anything else contained in this Charter Party, all loss, damage, delay, expenses, costs
413 and liabilities whatsoever arising out of or related to complying with, or resulting from failure to comply with,
414 such regulations or with Charterers' obligations hereunder shall be for the Charterers' account. The
415 Charterers shall indemnify the Owners against any and all claims whatsoever against the Owners arising out
416 of the Owners complying with the Charterers' instructions to load the agreed cargo.

417 (e) This Clause shall be without prejudice to the Charterers' obligations under this Charter Party to provide a
418 safe cargo. In relation to loading, anything done or not done by the Master or the Owners in compliance with
419 this Clause shall not amount to a waiver of any rights of the Owners.

420 any goods of a dangerous, injurious, flammable or corrosive nature unless carried in accordance with the
421 requirements or recommendations of the competent authorities of the country of the Vessel's registry, and
422 of ports of loading and discharge, and of any intermediate countries or ports through whose waters the
423 Vessel must pass. Without prejudice to the generality of the foregoing in addition the following are
424 specifically excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive
425 material, **Notwithstanding anything else contained in this Charter Party, Clause 30 to apply for the purpose**
426 **of cargo exclusions.**

427 **17.   Off-Hire**

428 In the event of loss of time from deficiency and/or default and/or strike of officers or ratings, or deficiency
429 of stores, fire, breakdown of, or damage to hull, machinery or equipment, grounding, detention by the arrest
430 of the Vessel, (unless such arrest is caused by events for which the Charterers, their sub-charterers, servants,
431 agents or sub-contractors are responsible), or detention by Port State control or other competent authority
432 for Vessel deficiencies, or detention by average accidents to the Vessel or cargo, unless resulting from
433 inherent vice, quality or defect of the cargo, drydocking for the purpose of examination, cleaning and/or
434 painting of underwater parts and/or repair, or by any other similar cause preventing the full working of the
435 Vessel, the payment of hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel
436 deviate or put back during a voyage, contrary to the orders or directions of the Charterers, for any reason
437 other than accident to the cargo or where permitted in Clause 22 (Liberties) hereunder, the hire to be
438 suspended from the time of her deviating or putting back until she is again in the same or equidistant position
439 from the destination and the voyage resumed therefrom. All bunkers used by the Vessel while off-hire shall
440 be for the Owners' account. In the event of the Vessel being driven into port or to anchorage through stress
441 of weather, trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or
442 expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be
443 reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and
444 the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be
445 deducted from the hire. Bunkers used by the Vessel while off-hire and the cost of replacing same shall be for
446 the Owners' account and therefore deducted from the hire.

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL
**NYPE 2015 TIME CHARTER**

| | | |
|---|---|---|
| 447 | **18.** | **Pollution** |

448  The Owners shall provide for standard oil pollution coverage equal to the level customarily offered by the
449  International Group of P&I Clubs, together with the appropriate certificates to that effect. (See also Clause 6
450  (Owners to Provide)).

| | | |
|---|---|---|
| 451 | **19.** | **Drydocking** |

452  The Vessel was last drydocked **on 26-January-2019**.

453  Except in case of emergency or under Clause 52(b), no drydocking shall take place during the currency of this
454  Charter Party.

| | | |
|---|---|---|
| 455 | **20.** | **Total Loss** |

456  Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being
457  last heard of) shall be returned to the Charterers at once.

| | | |
|---|---|---|
| 458 | **21.** | **Exceptions** |

459  The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the
460  seas, rivers, machinery, boilers and navigation, and errors of navigation throughout this Charter Party, always
461  mutually excepted.

| | | |
|---|---|---|
| 462 | **22.** | **Liberties** |

463  The Vessel shall have the liberty to sail with or without pilots, to tow and be towed, to assist vessels in
464  distress, and to deviate for the purpose of saving life and property.

| | | |
|---|---|---|
| 465 | **23.** | **Liens** |

466  The Owners shall have a lien upon all cargoes, sub-hires and sub-freights (including deadfreight and
467  demurrage) belonging or due to the Charterers or any sub-charterers, for any amounts due under this Charter
468  Party, including general average contributions, and the Charterers shall have a lien on the Vessel for all
469  monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once.

470  The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,
471  which might have priority over the title and interest of the Owners in the Vessel. The Charterers undertake
472  that during the period of this Charter Party, they will not procure any supplies or necessaries or services,
473  including any port expenses and bunkers, on the credit of the Owners.

| | | |
|---|---|---|
| 474 | **24.** | **Salvage** |

475  All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting the
476  Owners' and the Charterers' expenses and crew's proportion.

| | | |
|---|---|---|
| 477 | **25.** | **General Average** |
| 478 | | |

479  General average shall be adjusted according to York-Antwerp Rules 1994 and settled in US dollars in the same
480  place as stipulated in Clause 54 (Law and Arbitration). The Charterers shall procure that all bills of lading
481  issued during the currency of this Charter Party will contain a provision to the effect that general average
482  shall be adjusted according to York-Antwerp Rules 1994 and will include the "New Jason Clause" as per Clause
483  33(c). Time charter hire will not contribute to general average.
484

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

<p style="text-align:center"><span style="color:red">ORIGINAL</span><br>
<strong>NYPE 2015 TIME CHARTER</strong></p>

**485  26.  Navigation**

486   Nothing herein stated is to be construed as a demise of the Vessel to the Charterers. The Owners shall remain
487   responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew, and all other
488   matters, same as when trading for their own account.

**489  27.  Cargo Claims**

490   Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club
491   NYPE Agreement 1996 (as amended 1 September 2011), or any subsequent modification or replacement
492   thereof.

**493  28.  Cargo Handling Gear and Lights**

494   The Owners shall maintain the cargo handling gear of the Vessel providing lifting capacity as described in
495   Appendix A (Vessel Description). The Owners shall also provide on the Vessel for night work lights as on
496   board, but all additional lights over those on board shall be at the Charterers' expense. The Charterers shall
497   have the <u>free</u> use of any cargo handling gear on board the Vessel. If required by the Charterers, the Vessel
498   shall work night and day and all cargo handling gear shall be at the Charterers' disposal during loading and
499   discharging. In the event of disabled cargo handling gear, or insufficient power to operate the same, the
500   Vessel is to be considered to be off-hire to the extent that time is actually lost to the Charterers and the
501   Owners to pay stevedore stand-by charges occasioned thereby, unless such disablement or insufficiency of
502   power is caused by the Charterers' stevedores. If required by the Charterers, the Owners shall bear the cost
503   of hiring shore gear in lieu thereof, in which case the Vessel shall remain on-hire, except for actual time lost.

**504  29.  Solid Bulk Cargoes/Dangerous Goods**

505   (a)   The Charterers shall provide appropriate information on the cargo in advance of loading in accordance with
506   the requirements of the IMO International Maritime Solid Bulk Cargoes (IMSBC) Code to enable the
507   precautions which may be necessary for proper stowage and safe carriage to be put into effect. The
508   information shall be accompanied by a cargo declaration summarising the main details and stating that the
509   cargo is fully and accurately described and that, where applicable, the test results and other specifications
510   can be considered as representative for the cargo to be loaded.

511   (b)   If a cargo listed in the IMO International Maritime Dangerous Goods (IMDG) Code (website: www.imo.org) is
512   agreed to be carried, the Charterers shall provide a dangerous goods transport document and, where
513   applicable, a container/vehicle packing certificate in accordance with the IMDG Code requirements. The
514   dangerous goods transport document shall include a certificate or declaration that the goods are fully and
515   accurately described by the Proper Shipping Name, are classified, packaged, marked and labelled/placarded
516   correctly and are in all respects in proper condition for transport according to applicable international and
517   national government regulations.

518   (c)   The Master shall be entitled to refuse cargoes or, if already loaded, to unload them at the Charterers' risk
519   and expense if the Charterers fail to fulfil their IMSBC Code or IMDG Code obligations as applicable.

**520  30.  BIMCO Hull Fouling Clause for Time Charter Parties**
521

522   (a)   If, in accordance with the Charterers' orders, the Vessel remains at or shifts within a place, anchorage and/or
523   berth for an aggregated period exceeding:

524         (i) a period as the parties may agree in writing in a Tropical Zone or Seasonal Tropical Zone*; or

525         (ii) a period as the parties may agree in writing outside such Zones*

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

| | | |
|---|---|---|
| 526 | | any warranties concerning speed and consumption shall be suspended pending inspection of the Vessel's |
| 527 | | underwater parts including, but not limited to, the hull, sea chests, rudder and propeller. |

528    *If no such periods are agreed the default periods shall be 15 20 days.

529    (b)    In accordance with Sub-clause (a), either party may call for inspection which shall be arranged jointly by the
530    Owners and the Charterers and undertaken at the Charterers' risk, cost, expense and time. However if it is
531    customary for an underwater and/ or hull inspection and/ or cleaning to be conducted as per the port and/
532    or country requirement, the same it to be done by the Charterers at their cost/ risk/ time/ account, and the
533    Charterers are to make all the necessary arrangements to comply with any/ all requirements prior vessel
534    calling the respective port.

535    (c)    If, as a result of the inspection either party calls for cleaning of any of the underwater parts, such cleaning
536    shall be undertaken by the Charterers at their risk, cost, expense and time in consultation with the Owners.

537    (i) Cleaning shall always be under the supervision of the Master and, in respect of the underwater hull coating,
538    in accordance with the paint manufacturers' recommended guidelines on cleaning, if any. Such cleaning shall
539    be carried out without damage to the Vessel's underwater parts or coating.

540    (ii) If, at the port or place of inspection, cleaning as required under this Sub-clause (c) is not permitted or
541    possible, or if the Charterers choose to postpone cleaning, speed and consumption warranties shall remain
542    suspended until such cleaning has been completed.

543    (iii) If, despite the availability of suitable facilities and equipment, the Owners nevertheless refuse to permit
544    cleaning, the speed and consumption warranties shall be reinstated from the time of such refusal.

545    (d)    Cleaning in accordance with this Clause shall always be carried out prior to redelivery. If, nevertheless, the
546    Charterers are prevented from carrying out such cleaning, the parties shall, prior to but latest on redelivery,
547    agree a lump sum payment of USD 20,000.00 (Twenty Thousand United States Dollars) in full and final
548    settlement of the Owners' costs and expenses arising as a result of or in connection with the need for cleaning
549    pursuant to this Clause.

550    (e)    If the time limits set out in Sub-clause (a) have been exceeded but the Charterers thereafter demonstrate
551    that the Vessel's performance remains within the limits of this Charter Party the vessel's speed and
552    consumption warranties will be subsequently reinstated and the Charterers' obligations in respect of
553    inspection and/or cleaning shall no longer be applicable.
554

555    **31.    Bills of Lading**
556    (a)    The Master shall sign bills of lading or waybills for cargo as presented in conformity with mates' receipts.
557    However, the Charterers or their agents may sign bills of lading or waybills on behalf of the Master, with the
558    Owners'/Master's prior written authority, always in conformity with mates' receipts.

559    (b)    All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify
560    the Owners against all consequences or liabilities which may arise from any inconsistency between this
561    Charter Party and any bills of lading or waybills signed by the Charterers or their agents or by the Master at
562    their request.

563    (c)    Bills of lading covering deck cargo shall be claused: "Shipped on deck at the Charterers', Shippers' and
564    Receivers' risk, expense and responsibility, without liability on the part of the Vessel or her Owners for any
565    loss, damage, expense or delay howsoever caused."

566    (d)    In case Bill(s) of Lading incorporate any different Charter Party than present one and any claim is brought
567    against Owners under Bill(s) of Lading, Charterers shall furnish Owners with a copy of such applicable Charter
568    Party in order to try and defend the claim.

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

569 **32.** **BIMCO Electronic Bills of Lading Clause**

570

571 (a)   ~~At the Charterers' option, bills of lading, waybills and delivery orders referred to in this Charter Party shall be~~
572   ~~issued, signed and transmitted in electronic form with the same effect as their paper equivalent.~~

573 (b)   ~~For the purpose of Sub-clause (a) the Owners shall subscribe to and use Electronic (Paperless) Trading~~
574   ~~Systems as directed by the Charterers, provided such systems are approved by the International Group of~~
575   ~~P&I Clubs. Any fees incurred in subscribing to or for using such systems shall be for the Charterers' account.~~

576 (c)   ~~The Charterers agree to hold the Owners harmless in respect of any additional liability arising from the use~~
577   ~~of the systems referred to in Sub-clause (b), to the extent that such liability does not arise from Owners'~~
578   ~~negligence.~~

579

580 **33.** **Protective Clauses**

581   The following protective clauses shall be deemed to form part of this Charter Party and all Bills of Lading or
582   waybills issued under this Charter Party shall contain the following clauses. (See also Clauses 100-102)

583

584 (a)   **General Clause Paramount**

585

586   This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United
587   States, the Hague Rules, or the Hague Visby Rules, as applicable, or such other similar national legislation as
588   may mandatorily apply by virtue of origin or destination of the bill of lading, (or if no such enactments are
589   mandatorily applicable, the terms of the Hague Rules shall apply) which shall be deemed to be incorporated
590   herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or
591   immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of
592   lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

593   And

594

595 (b)   **Both-to-Blame Collision Clause**

596

597   "If the ship comes into collision with another ship as a result of the negligence of the other ship and any act,
598   neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the
599   management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss
600   or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of,
601   or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
602   carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or
603   non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

604   The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or
605   objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or
606   contact."

607   And

608

609 (c)   **New Jason Clause**

610

611   "In the event of accident, danger, damage or disaster before or after the commencement of the voyage,
612   resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences
613   of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees,
614   or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices,
615   losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1993 and 2015.

ORIGINAL
**NYPE 2015 TIME CHARTER**

616     special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage
617     shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his
618     agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special
619     charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the
620     Carrier before delivery."
621

622    **34.**    **BIMCO War Risks Clause CONWARTIME 2013**
623

624    (a)    For the purpose of this Clause, the words:

625      (i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other
626      operators who are charged with the management of the Vessel, and the Master; and

627      (ii) "War Risks" shall include any actual, threatened or reported:

628      war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike operations; laying of
629      mines; acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"); acts of terrorists;
630      acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively
631      against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever),
632      by any person, body, terrorist or political group, or the government of any state or territory whether
633      recognized or not, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous
634      or may become dangerous to the Vessel, cargo, crew or other persons on board the Vessel.

635    (b)    The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or
636      zone, or any waterway or canal (hereinafter "Area"), where it appears that the Vessel, cargo, crew or other
637      persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be exposed
638      to War Risks whether such risk existed at the time of entering into this Charter Party or occurred thereafter.
639      Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or may become
640      dangerous, after entry into it, the Vessel shall be at liberty to leave it.

641    (c)    The Vessel shall not be required to load contraband cargo, or to pass through any blockade as set out in Sub-
642      clause (a), or to proceed to an Area where it may be subject to search and/or confiscation by a belligerent.

643    (d)    If the Vessel proceeds to or through an Area exposed to War Risks, the Charterers shall reimburse to the
644      Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances
645      that the Owners reasonably require in connection with War Risks.

646    (e)    All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners'
647      supported invoices or on redelivery, whichever occurs first.

648    (f)    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional
649      wages in respect of sailing into an Area which is dangerous in the manner defined by the said terms, then the
650      actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time
651      as the next payment of hire is due, or upon redelivery, whichever occurs first.

652    (g)    The Vessel shall have liberty:

653      (i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in
654      convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever,
655      which are given by the government of the nation under whose flag the Vessel sails, or other government to
656      whose laws the Owners are subject, or any other government of any state or territory whether recognized
657      or not, body or group whatsoever acting with the power to compel compliance with their orders or directions;

658      (ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

659     (iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective
660     orders of any other Supranational body which has the right to issue and give the same, and with national
661     laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of
662     those who are charged with their enforcement;

663     (iv) to discharge at any alternative port any cargo or part thereof which may expose the Vessel to being held
664     liable as a contraband carrier;

665     (v) to call at any alternative port to change the crew or any part thereof or other persons on board the Vessel
666     when there is reason to believe that they may be subject to internment, imprisonment, detention or similar
667     measures.

668  **(h)**  If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to
669     proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the
670     Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of
671     the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such
672     nomination by the Charterers within forty-eight (48) hours of the receipt of such notice and request, the
673     Owners may discharge the cargo at any safe port of their own choice. All costs, risk and expenses for the
674     alternative discharge shall be for the Charterers' account.

675  **(i)**  The Charterers shall indemnify the Owners for claims arising out of the Vessel proceeding in accordance with
676     any of the provisions of Sub-clauses (b) to (h) which are made under any bills of lading, waybills or other
677     documents evidencing contracts of carriage.

678  **(j)**  When acting in accordance with any of the provisions of Sub-clauses (b) to (h) of this Clause anything is done
679     or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter
680     Party.
681

682  **35.**   **Ice**

683     The Vessel shall not be obliged to force ice but, subject to the Owners' prior approval having due regard to
684     its size, construction and class, may follow ice-breakers. The Vessel shall not be required to enter or remain
685     in any icebound port or area, nor any port or area where lights or lightships have been or are about to be
686     withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the Vessel will not
687     be able on account of ice to safely enter and remain in the port or area or to get out after having completed
688     loading or discharging.

689  **36.**   **Requisition**

690     Should the Vessel be requisitioned by the government of the Vessel's flag or other government to whose
691     laws the Owners are subject during the period of this Charter Party, the Vessel shall be deemed to be off-hire
692     during the period of such requisition, and any hire paid by the said government in respect of such requisition
693     period shall be retained by Owners. The period during which the Vessel is on requisition to the said
694     government shall count as part of the period provided for in this Charter Party.

695     If the period of requisition exceeds ninety (90) days, either party shall have the option of cancelling this
696     Charter Party and no consequential claim in respect thereof may be made by either party.

697  **37.**   **Stevedore Damage**

698     Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage
699     to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents in
700     writing within twenty-four (24) hours of the occurrence but in case of hidden damage latest when the damage

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

701   could have been discovered by the exercise of due diligence. Such notice to describe the damage and to invite
702   Charterers to appoint a surveyor to assess the extent of such damage.

703   (a)   In case of any and all damage affecting the Vessel's seaworthiness and/or the safety of the crew and/or
704   affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such
705   damage at their expense (including any Class and/ or PNI surveyors fees). and the Vessel is to remain on-hire
706   until such repairs are completed and if required passed by the Vessel's classification society.

707   (b)   Any and all damage not described under Sub-clause (a) above shall be repaired, at the Charterers' option,
708   before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will be
709   paid to the Owners except and insofar as the time and/or expenses required for the repairs for which the
710   Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.
711   Should the Stevedore Damages not affect the seaworthiness or commercial operations or the Class of the
712   Vessel, then the Charterers shall have the liberty to redeliver the vessel without repairing the damages, which
713   have occurred. However, the Charterers guarantee to reimburse costs of repair (including any Class and/ or
714   PNI surveyors fees) as soon as Owners have provided the invoice for repairs whether carried out by the crew
715   (materials and crew time used), or a shore repair firm or dockyard. The Charterers are to settle stevedore
716   damages with the Owners upon receipt of the repair invoice whether the Charterers have settled with sub-
717   Charterers/ stevedores or not.

718   **38.**   **Slow Steaming**
719

720   (a)   The Charterers may at their discretion provide, in writing to the Master, instructions to reduce speed or
721   Revolutions Per Minute (main engine RPM) and/or instructions to adjust the Vessel's speed to meet a
722   specified time of arrival at a particular destination.

723   (i)* Slow Steaming – Where the Charterers give instructions to the Master to adjust the speed or RPM, the
724   Master shall, subject always to the Master's obligations in respect of the safety of the Vessel, crew and cargo
725   and the protection of the marine environment, comply with such written instructions, provided that the
726   engine(s) continue(s) to operate above the cut-out point of the Vessel's engine(s) auxiliary blower(s) and that
727   such instructions will not result in the Vessel's engine(s) and/or equipment operating outside the
728   manufacturers'/designers' recommendations as published from time to time.

729   (ii)* Ultra-Slow Steaming – Where the Charterers give instructions to the Master to adjust the speed or RPM,
730   regardless of whether this results in the engine(s) operating above or below the cut-out point of the Vessel's
731   engine(s) auxiliary blower(s), the Master shall, subject always to the Master's obligations in respect of the
732   safety of the Vessel, crew and cargo and the protection of the marine environment, comply with such written
733   instructions, provided that such instructions will not result in the Vessel's engine(s) and/or equipment
734   operating outside the manufacturers'/designers' recommendations as published from time to time. If the
735   manufacturers'/designers' recommendations issued subsequent to the date of this Charter Party require
736   additional physical modifications to the engine or related equipment or require the purchase of additional
737   spares or equipment, the Master shall not be obliged to comply with these instructions.

738   *Sub-clauses (a)(i) and (a)(ii) are alternatives; delete whichever is not applicable. In the absence of deletions,
739   alternative (a)(i) shall apply.

740   (b)   At all speeds the Owners shall exercise due diligence to ensure that the Vessel is operated in a manner which
741   minimises fuel consumption, always taking into account and subject to the following:

742   (i) the Owners' warranties under this Charter Party relating to the Vessel's speed andconsumption;

743   (ii) the Charterers' instructions as to the Vessel's speed and/or RPM and/or specified time of arrival at a
744   particular destination;

745   (iii) the safety of the Vessel, crew and cargo and the protection of the marine environment; and

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO
SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes
are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

746  (iv) the Owners' obligations under any bills of lading, waybills or other documents evidencing contracts of
747  carriage issued by them or on their behalf.

748  (c)  For the purposes of Sub-clause (b), the Owners shall exercise due diligence to minimise fuel consumption:

749  (i) when planning voyages, adjusting the Vessel's trim and operating main engine(s) and auxiliary engine(s);

750  (ii) by making optimal use of the Vessel's navigation equipment and any additional aids provided by the
751  Charterers, such as weather routing, voyage optimization and performance monitoring systems; and

752  (iii) by directing the Master to report any data that the Charterers may reasonably request to further improve
753  the energy efficiency of the Vessel.

754  (d)  The Owners and the Charterers shall share any findings and best practices that they may have identified on
755  potential improvements to the Vessel's energy efficiency.

756  (e)  For the avoidance of doubt, where the Vessel proceeds at a reduced speed or with reduced RPM pursuant to
757  Sub-clause (a), then provided that the Master has exercised due diligence to comply with such instructions,
758  this shall constitute compliance with, and there shall be no breach of, any obligation requiring the Vessel to
759  proceed with utmost and/or due despatch (or any other such similar/equivalent expression).

760  (f)  The Charterers shall procure that this Clause be incorporated into all sub-charters and contracts of carriage
761  issued pursuant to this Charter Party. The Charterers shall indemnify the Owners against all consequences
762  and liabilities that may arise from bills of lading, waybills or other documents evidencing contracts of carriage
763  being issued as presented to the extent that the terms of such bills of lading, waybills or other documents
764  evidencing contracts of carriage impose or result in breach of the Owners' obligation to proceed with due
765  despatch or are to be held to be a deviation or the imposition of more onerous liabilities upon the Owners
766  than those assumed by the Owners pursuant to this Clause.
767

768  **39.   BIMCO Piracy Clause for Time Charter Parties 2013**
769

770  (a)  The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or
771  zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or
772  the Owners, is dangerous to the Vessel, her cargo, crew or other persons on board the Vessel due to any
773  actual, threatened or reported acts of piracy and/or violent robbery and/or capture/seizure (hereinafter
774  "Piracy"), whether such risk existed at the time of entering into this Charter Party or occurred thereafter.
775  Should the Vessel be within any such place as aforesaid which only becomes dangerous, or may become
776  dangerous, after her entry into it, she shall be at liberty to leave it.

777  (b)  If in accordance with Sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or
778  through the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue
779  alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading
780  caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result
781  of complying with such orders shall not be considered off-hire.

782  (c)  If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners
783  shall have the liberty:

784  (i) to take reasonable preventative measures to protect the Vessel, crew and cargo including but not limited
785  to re-routing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation,
786  adjusting speed  or course, or engaging security personnel and/or deploying equipment on or about the
787  Vessel (including embarkation/disembarkation);

788  (ii) to comply with underwriters' requirements under the terms of the Vessel's insurance(s);

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

789  (iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation
790  under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other
791  Government, body or group (including military authorities) whatsoever acting with the power to compel
792  compliance with their orders or directions; and

793  (iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective
794  orders of any other Supranational body which has the right to issue and give the same, and with national
795  laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of
796  those who are charged with their enforcement;

797  and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties
798  caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional
799  insurance as provided in Sub-clause (d)(iii).

800  (d)  Costs

801  (i) if the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred
802  including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable
803  costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended
804  routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account
805  and the Vessel shall remain on hire;

806  (ii) if the Owners become liable under the terms of employment to pay to the crew any bonus or additional
807  wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the
808  actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

809  (iii) if the Vessel proceeds to or through an Area exposed to the risk of Piracy, the Charterers shall reimburse
810  to the Owners any additional premiums required by the Owners' insurers and the costs of any additional
811  insurances that the Owners reasonably require in connection with Piracy risks which may include but not be
812  limited to War Loss of Hire and/or maritime Kidnap and Ransom (K&R); and

813  (iv) all payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of the Owners'
814  supported invoices or on redelivery, whichever occurs first.

815  (e)  If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall
816  remain on hire.

817  (f)  If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made
818  to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers'
819  obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day
820  after the seizure until release. The Charterers shall pay hire, or if the Vessel has been redelivered, the
821  equivalent of Charter Party hire, for any time lost in making good any damage and deterioration resulting
822  from the seizure. The Charterers shall not be liable for late redelivery under this Charter Party resulting from
823  the seizure of the Vessel.

824  (g)  If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall
825  be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this
826  Clause and any implied or express provision of the Charter Party, this Clause shall prevail.
827

828  **40.  Taxes**

829  Charterers are to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners
830  resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter
831  Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

| | | |
|---|---|---|
| 832 | | taxes levied by the country of the flag of the Vessel or the Owners). In the event the Owners/Vessel/her flag |
| 833 | | state are exempt from any taxes, the Owners shall seek such exemption and filing costs for such exemption, |
| 834 | | if any, shall be for the Charterers' account and no charge for such taxes shall be assessed to the Charterers. |

| 835 | **41.** | **Industrial Action** |
|---|---|---|
| 836 | | In the event of the Vessel being delayed or rendered inoperative by strikes, labor stoppages or boycotts or |
| 837 | | any other difficulties arising from the Vessel's ownership, crew or terms of employment of the crew of the |
| 838 | | chartered Vessel or any other vessel under the same ownership, operation and control, any time lost is to be |
| 839 | | considered off-hire. The Owners guarantee that on delivery the minimum terms and conditions of |
| 840 | | employment of the crew of the Vessel are in accordance with the International Labour Organization Maritime |
| 841 | | Labour Convention (MLC) 2006, and will remain so throughout the duration of this Charter Party. |

| 842 | **42.** | **Stowaways** |
|---|---|---|
| 843 | (a) | If stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers or |
| 844 | | by any other means related to the cargo operation, this shall amount to breach of this Charter Party. The |
| 845 | | Charterers shall be liable for the consequences of such breach and hold the Owners harmless and keep them |
| 846 | | indemnified against all claims; costs (including but not limited to victualing costs for stowaways whilst on |
| 847 | | board and repatriation); losses; and fines or penalties, which may arise and be made against them. The |
| 848 | | Charterers shall, if required, place the Owners in funds to put up bail or other security. The Vessel shall remain |
| 849 | | on hire for any time lost as a result of such breach. |

| 850 | (b) | Save for those stowaways referred to in Sub-clause (a), if stowaways have gained access to the Vessel this |
|---|---|---|
| 851 | | shall amount to a breach of this Charter Party. The Owners shall be liable for the consequences of such breach |
| 852 | | and hold the Charterers harmless and keep them indemnified against all claims; costs; losses; and fines or |
| 853 | | penalties, which may arise and be made against them. The Vessel shall be off-hire for any time lost as a result |
| 854 | | of such breach. |

| 855 | **43.** | **Smuggling** |
|---|---|---|
| 856 | (a) | In the event of smuggling by the Master, other Officers and/or ratings, this shall amount to a breach of this |
| 857 | | Charter Party. The Owners shall be liable for the consequences of such breach and hold the Charterers |
| 858 | | harmless and keep them indemnified against all claims, costs, losses, and fines and penalties which may arise |
| 859 | | and be made against them. The Vessel shall be off-hire for any time lost as a result of such breach. |

| 860 | (b) | If unmanifested narcotic drugs and/or any other illegal substances are found secreted in the goods and/or |
|---|---|---|
| 861 | | containers or by any other means related to the cargo operation, this shall amount to a breach of this Charter |
| 862 | | Party. The Charterers shall be liable for the consequences of such breach and hold the Owners, Master, |
| 863 | | officers and ratings of the Vessel harmless and keep them indemnified against all claims, costs, losses, and |
| 864 | | fines and penalties which may arise and be made against them individually or jointly. The Charterers shall, if |
| 865 | | required, place the Owners in funds to put up bail or other security. The Vessel shall remain on hire for any |
| 866 | | time lost as a result of such breach. |

| 867 | **44.** | **International Safety Management (ISM)** |
|---|---|---|
| 868 | | |
| 869 | | During the duration of this Charter Party, the Owners shall procure that both the Vessel and "the Company" |
| 870 | | (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners |
| 871 | | shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate |
| 872 | | (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expense or delay |
| 873 | | caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the |
| 874 | | Owners' account. |
| 875 | | |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

<div align="center">ORIGINAL</div>

<div align="center">**NYPE 2015 TIME CHARTER**</div>

876 **45.** **International Ship and Port Facility Security Code (ISPS Code)/Maritime Transportation Security Act**
877 **(MTSA)**
878

879 (a) (i) The Owners shall comply with the requirements of the ISPS and the relevant amendments to Chapter XI of
880 Safety of Life at Sea (SOLAS) (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS
881 Code). If trading to or from the US or passing through US waters, the Owners shall also comply with the
882 requirements of the MTSA relating to the Vessel and the "Owner" (as defined by the MTSA).

883 (ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship
884 Security Certificate (ISSC) (or the interim ISSC) and the full style contact details of the Company Security
885 Officer (CSO).

886 (iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by
887 failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS
888 Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter
889 Party.

890 (b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon
891 request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting
892 is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all
893 sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure
894 that all sub-charter parties they enter into during the period of this Charter Party contain the following
895 provision:

896 "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is
897 permitted under the terms of the charter party, shall ensure that contact details of all sub-charterers are
898 likewise provided to the Owners".

899 (ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by
900 failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except
901 as otherwise provided in this Charter Party.

902 (c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising
903 out of or related to security regulations or measures required by the port facility or any relevant authority in
904 accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel
905 escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or
906 expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the
907 Vessel, the nationality of the crew, crew visas, the Vessel's flag or the identity of the Owners' managers. All
908 measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

909 (d) If either party makes any payment which is for the other party's account according to this Clause, the other
910 party shall indemnify the paying party.
911

912 **46.** **Sanctions**

913 (a) The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage,
914 trade or on a voyage which, in the reasonable judgement of the Owners, will expose the Vessel, Owners,
915 managers, crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any
916 State, Supranational or International Governmental Organization.

917 (b) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently
918 applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall
919 be obliged to issue alternative voyage orders within forty-eight (48) hours of receipt of the Owners'
920 notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

<div align="center">ORIGINAL</div>
<div align="center">**NYPE 2015 TIME CHARTER**</div>

| 921 | | ~~Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel~~ |
| 922 | | ~~to remain on hire pending completion of the Charterers' alternative voyage orders or delivery of cargo by the~~ |
| 923 | | ~~Owners and the Charterers to remain responsible for all additional costs and expenses incurred in connection~~ |
| 924 | | ~~with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done,~~ |
| 925 | | ~~such shall not be deemed a deviation.~~ |

| 926 | ~~(c)~~ | ~~The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of~~ |
| 927 | | ~~the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the~~ |
| 928 | | ~~Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-~~ |
| 929 | | ~~clause (b).~~ |

| 930 | ~~(d)~~ | ~~The Charterers shall procure that this Clause shall be incorporated into all sub-charters issued pursuant to~~ |
| 931 | | ~~this Charter Party.~~ See Clause 103 |

| 932 | **47.** | **BIMCO Designated Entities Clause for Charter Parties** |
| 933 | | |

| 934 | ~~(a)~~ | ~~The provisions of this clause shall apply in relation to any sanction, prohibition or restriction imposed on any~~ |
| 935 | | ~~specified persons, entities or bodies including the designation of specified vessels or fleets under United~~ |
| 936 | | ~~Nations Resolutions or trade or economic sanctions, laws or regulations of the European Union or the United~~ |
| 937 | | ~~States of America.~~ |

| 938 | ~~(b)~~ | ~~The Owners and the Charterers respectively warrant for themselves (and in the case of any sublet, the~~ |
| 939 | | ~~Charterers further warrant in respect of any sub-charterers, shippers, receivers, or cargo interests) that at~~ |
| 940 | | ~~the date of this fixture and throughout the duration of this Charter Party they are not subject to any of the~~ |
| 941 | | ~~sanctions, prohibitions, restrictions or designation referred to in Sub-clause (a) which prohibit or render~~ |
| 942 | | ~~unlawful any performance under this Charter Party or any sublet or any Bills of Lading. The Owners further~~ |
| 943 | | ~~warrant that the nominated vessel, or any substitute, is not a designated vessel.~~ |

| 944 | ~~(c)~~ | ~~If at any time during the performance of this Charter Party either party becomes aware that the other party~~ |
| 945 | | ~~is in breach of warranty as aforesaid, the party not in breach shall comply with the laws and regulations of~~ |
| 946 | | ~~any Government to which that party or the Vessel is subject, and follow any orders or directions which may~~ |
| 947 | | ~~be given by any body acting with powers to compel compliance, including where applicable the Owners' flag~~ |
| 948 | | ~~State. In the absence of any such orders, directions, laws or regulations, the party not in breach may, in its~~ |
| 949 | | ~~option, terminate the Charter Party forthwith or, if cargo is on board, direct the Vessel to any safe port of~~ |
| 950 | | ~~that party's choice and there discharge the cargo or part thereof.~~ |

| 951 | ~~(d)~~ | ~~If, in compliance with the provisions of this Clause, anything is done or is not done, such shall not be deemed~~ |
| 952 | | ~~a deviation but shall be considered due fulfilment of this Charter Party.~~ |

| 953 | ~~(e)~~ | ~~Notwithstanding anything in this Clause to the contrary, the Owners or the Charterers shall not be required~~ |
| 954 | | ~~to do anything which constitutes a violation of the laws and regulations of any State to which either of them~~ |
| 955 | | ~~is subject.~~ |

| 956 | ~~(f)~~ | ~~The Owners or the Charterers shall be liable to indemnify the other party against any and all claims, losses,~~ |
| 957 | | ~~damage, costs and fines whatsoever suffered by the other party resulting from any breach of warranty as~~ |
| 958 | | ~~aforesaid.~~ |

| 959 | ~~(g)~~ | ~~The Charterers shall procure that this Clause is incorporated into all sub-charters, contracts of carriage and~~ |
| 960 | | ~~Bills of Lading issued pursuant to this Charter Party.~~ See Clause 103 |
| 961 | | |

| 962 | **48.** | **BIMCO North American Advance Cargo Notification Clause for Time Charter Parties** |
| 963 | | |
| 964 | (a) | If the Vessel loads or carries cargo destined for the US or Canada or passing through US or Canadian ports in |
| 965 | | transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or the Canada |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

<div align="center">

ORIGINAL

**NYPE 2015 TIME CHARTER**

</div>

966  Border Services Agency regulations (Memorandum D3-5-2) or any subsequent amendments thereto and shall
967  undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and
968  expense:

969  (i) have in place a Standard Carrier Alpha Code (SCAC)/Canadian Customs Carrier Code;

970  (ii) for US trade, have in place an International Carrier Bond (ICB);

971  (iii) provide the Owners with a timely confirmation of (i) and (ii) above as appropriate; and

972  (iv) submit a cargo declaration by Automated Manifest System (AMS) to the US Customs or by ACI Automated
973  Commercial Information (ACI) to the Canadian customs, and provide the Owners at the same time with a
974  copy thereof.

975  (b)  The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any
976  loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines,
977  penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the
978  Charterers' failure to comply with any of the provisions of Sub-clause (a). Should such failure result in any
979  delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on
980  hire.

981  (c)  If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the
982  responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

983  (d)  The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US
984  Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading,
985  other contract, law or regulation.
986

987  **49.**  **BIMCO U.S. Census Bureau Mandatory Automated Export System (AES) Clause for Time Charter Parties**
988

989  (a)  If the Vessel loads cargo in any US port or place, the Charterers shall comply with the current US Census
990  Bureau Regulations (15 CFR 30) or any subsequent amendments thereto and shall undertake the role of
991  carrier for the purposes of such regulations and shall, in their own name, time and expense:

992  (i) have in place a SCAC (Standard Carrier Alpha Code);

993  (ii) have in place an ICB (International Carrier Bond);

994  (iii) provide the Owners with a timely confirmation of (i) and (ii) above; and

995  (iv) submit an export ocean manifest by Automated Export System (AES) to the US Census Bureau and provide
996  the Owners at the same time with a copy thereof.

997  (b)  The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any
998  loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines,
999  penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the
1000  Charterers' failure to comply with any of the provisions of Sub-clause (a). Should such failure result in any
1001  delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on
1002  hire.

1003  (c)  If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the
1004  responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

<p style="text-align:center;color:red;">ORIGINAL</p>

**NYPE 2015 TIME CHARTER**

| | | |
|---|---|---|
| 1005 | (d) | The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US |
| 1006 | | Census Bureau Regulations (15 CFR 30) shall be without prejudice to the identity of carrier under any bill of |
| 1007 | | lading, other contract, law or regulation. |
| 1008 | | |

| | | |
|---|---|---|
| 1009 | **50.** | **BIMCO EU Advance Cargo Declaration Clause for Time Charter Parties 2012** |
| 1010 | | |
| 1011 | (a) | If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU ("Exported") or |
| 1012 | | loads cargo outside the EU destined for an EU port or place or passing through EU ports or places in transit |
| 1013 | | ("Imported"), the Charterers shall, for the purposes of this Clause, comply with the requirements of the EU |
| 1014 | | Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, |
| 1015 | | Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall, in their |
| 1016 | | own name, and in their time and at their expense: |

| | |
|---|---|
| 1017 | (i) have in place an Economic Operator Registration and Identification (EORI) number; |
| 1018 | (ii) provide the Owners with a timely confirmation of (i) above as appropriate; and |
| 1019 | (iii) where the cargo is being: |

| | | |
|---|---|---|
| 1020 | 1. | Exported: Submit, or arrange for the submission of, a customs declaration for export or, if a customs |
| 1021 | | declaration or a re-export notification is not required, an exit summary declaration; or |
| 1022 | 2. | Imported: Submit, or arrange for the submission of, an entry summary declaration. |

| | |
|---|---|
| 1023 | Unless otherwise permitted by the relevant customs authorities, such declarations shall be submitted to |
| 1024 | them electronically. |

| | | |
|---|---|---|
| 1025 | (b) | The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any |
| 1026 | | loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including |
| 1027 | | but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of Sub- |
| 1028 | | clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to |
| 1029 | | the contrary, the Vessel shall remain on hire. |
| 1030 | | |

| | | |
|---|---|---|
| 1031 | **51.** | **Ballast Water Exchange Regulations** |
| 1032 | | If ballast water exchanges are required by any coastal state where the vessel is trading, the Owners/Master |
| 1033 | | shall comply with same at the Charterers' time, risk, and expense. |

| | | |
|---|---|---|
| 1034 | **52.** | **Period Applicable Clauses** |
| 1035 | | If the minimum period of this Charter Party exceeds five (5) months, the following Sub-clauses shall apply: |

| | | |
|---|---|---|
| 1036 | (a) | Should the Vessel at the expiry of the described employment period be on a ballast voyage to the place of |
| 1037 | | redelivery or on a laden voyage, reasonably expected to be completed within the employment period when |
| 1038 | | commenced, the Charterers shall have the use of the Vessel on the same conditions and at the same rate or |
| 1039 | | the prevailing market rate, whichever is higher, for any extended time as may be necessary for the |
| 1040 | | completion of the last voyage of the Vessel to the place of redelivery. |

| | | |
|---|---|---|
| 1041 | (b) | Drydocking |
| 1042 | | ~~The Owners shall have the option to place the Vessel in drydock during the currency of this Charter Party at~~ |
| 1043 | | ~~a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~ |
| 1044 | | ~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances. (See also Clause~~ |
| 1045 | | ~~19 (Drydocking))~~. (See Clause 19 (Drydocking)). |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

**NYPE 2015 TIME CHARTER**

1046 (c)      Off-hire

1047      The Charterers to have the option of adding any time the Vessel is off-hire to the Charter period. Such option
1048      shall be declared in writing not less than one (1) month before the expected date of redelivery, or latest one
1049      (1) week after the event if such event occurs less than one (1) month before the expected date of redelivery.

1050 (d)      Charterers' Colors

1051      ~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their own~~
1052      ~~markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter Party. Cost~~
1053      ~~and time of painting, maintaining and repainting those changes effected by the Charterers shall be for the~~
1054      ~~Charterers' account.~~

1055 **53.**   **Commissions**

1056      ~~A commission of  per cent is payable by the Vessel and the Owners to  on~~
1057      ~~hire earned and paid under this Charter Party, and also upon any continuation or extension of this Charter~~
1058      ~~Party.~~

1059      An address commission of **3.75** per cent on the hire earned shall be deducted by the Charterers on payment
1060      of the hire earned under this Charter Party.

1061 **54.**   **Law and Arbitration**
1062
1063 (a)*   **New York.** ~~This Charter Party shall be governed by United States maritime law. Any dispute arising out of or~~
1064      ~~in connection with this Charter Party shall be referred to three persons at New York, one to be appointed by~~
1065      ~~each of the parties hereto, and the third by the two so chosen. The award of the arbitrators or any two of~~
1066      ~~them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by~~
1067      ~~any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the~~
1068      ~~Society of Maritime Arbitrators, Inc. (SMA) current at the time this Charter Party was entered into.~~

1069      ~~In cases where neither the claim nor any counter claim exceeds the sum of US$ 100,000 (or such other sum~~
1070      ~~as the parties may agree), the arbitration shall be conducted before a sole arbitrator in accordance with the~~
1071      ~~Shortened Arbitration Procedure of the SMA current at the time this Charter Party was entered into.~~
1072      ~~(www.smany.org).~~

1073 (b)*   **London.** This Charter Party shall be governed by and construed in accordance with English law and any
1074      dispute arising out of or in connection with this Charter Party shall be referred to arbitration in London in
1075      accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the
1076      extent necessary to give effect to the provisions of this Clause.

1077      The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association  (LMAA)
1078      Terms current at the time when the arbitration proceedings are commenced.

1079      The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its
1080      arbitrator and send notice of such appointment in writing to the other party requiring the other party to
1081      appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its
1082      arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has
1083      done so within the fourteen (14) days specified. If the other party does not appoint its own arbitrator and
1084      give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to
1085      arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator
1086      as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding
1087      on both parties as if he had been appointed by agreement.

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL
**NYPE 2015 TIME CHARTER**

| 1088 | | Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the |
| 1089 | | appointment of a sole arbitrator. |

1090      In cases where neither the claim nor any counterclaim exceeds the sum of US$ ~~100,000~~ 50,000 (or such other
1091      sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims
1092      Procedure current at the time when the arbitration proceedings are commenced. (www.lmaa.org.uk)

1093  (c)*  ~~Singapore. This Charter Party shall be governed by and construed in accordance with Singapore\*\*/English\*\*~~
1094      ~~law.~~

1095      ~~Any dispute arising out of or in connection with this Charter Party, including any question regarding its~~
1096      ~~existence, validity or termination shall be referred to and finally resolved by arbitration in Singapore in~~
1097      ~~accordance with the Singapore International Arbitration Act (Chapter 143A) and any statutory modification~~
1098      ~~or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.~~

1099      ~~The arbitration shall be conducted in accordance with the Arbitration Rules of the Singapore Chamber of~~
1100      ~~Maritime Arbitration (SCMA) current at the time when the arbitration proceedings are commenced.~~

1101      ~~The reference to arbitration of disputes under this clause shall be to three arbitrators. A party wishing to~~
1102      ~~refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to~~
1103      ~~the other party requiring the other party to appoint its own arbitrator and give notice that it has done so~~
1104      ~~within fourteen (14) calendar days of that notice and stating that it will appoint its own arbitrator as sole~~
1105      ~~arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the~~
1106      ~~fourteen (14) days specified. If the other party does not give notice that it has done so within the fourteen~~
1107      ~~(14) days specified, the party referring a dispute to arbitration may, without the requirement of any further~~
1108      ~~prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party~~
1109      ~~accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by~~
1110      ~~agreement.~~

1111      ~~Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the~~
1112      ~~appointment of a sole arbitrator.~~

1113      ~~In cases where neither the claim nor any counterclaim exceeds the sum of US$ 150,000 (or such other sum~~
1114      ~~as the parties may agree) the arbitration shall be conducted before a single arbitrator in accordance with the~~
1115      ~~SCMA Small Claims Procedure current at the time when the arbitration proceedings are commenced.~~
1116      ~~(www.scma.org.sg)~~

1117  (d)*  This Charter Party shall be governed by and construed in accordance with the laws of the place mutually
1118      agreed by the parties and any dispute arising out of or in connection with this Charter Party shall be referred
1119      to arbitration at a mutually agreed place, subject to the procedures applicable there.

1120      *Sub-clauses (a), (b), (c) and (d) are alternatives; indicate alternative agreed. If alternative (d) agreed also
1121      state the place of arbitration. If no alternative agreed and clearly indicated then Sub-clause (a) shall apply by
1122      default.

1123      **Singapore and English law are alternatives; if Sub-clause (c) agreed also indicate choice of Singapore or
1124      English law. If neither or both are indicated, then English law shall apply by default.
1125

1126  **55.**  **Notices**

1127      All notices, requests and other communications required or permitted by any clause of this Charter Party
1128      shall be given in writing and shall be sufficiently given or transmitted if delivered by hand, email, express
1129      courier service or registered mail and addressed if to the Owners, to        or such other address or email
1130      address as the Owners may hereafter designate in writing, and if to the Charterers to        or such other

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

1131    address or email address as the Charterers may hereafter designate in writing. Any such communication shall
1132    be deemed to have been given on the date of actual receipt by the party to which it is addressed.

1133    **56.**    **Headings**

1134    The headings in this Charter Party are for identification only and shall not be deemed to be part hereof or be
1135    taken into consideration in the interpretation or construction of this Charter Party.

1136    **57.**    **Singular/Plural**

1137    The singular includes the plural and vice-versa as the context admits or requires.

1138    Clauses **58** to **111**, both inclusive, as attached hereto are fully incorporated in this Charter Party.

OWNERS:

Name: MIDARO WNDY MORIMOR
Title: DIRECTOR

CHARTERERS:

Name XO Shipping A/S
Title:

1139

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this BIMCO SmartCon document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

CHECKED
BY DIABOS

ORIGINAL
**NYPE 2015 TIME CHARTER**

## NYPE 2015 APPENDIX A (VESSEL DESCRIPTION)

~~GENERAL INFORMATION~~ (See Clause 58 Vessel Description)

| | | |
|---|---|---|
| ~~1.1~~ | ~~Vessel's name~~ | |
| ~~1.2~~ | ~~Type of vessel~~ | |
| ~~1.3~~ | ~~IMO number~~ | |
| ~~1.4~~ | ~~Year of build~~ | |
| ~~1.5~~ | ~~Name of shipyard/where built~~ | / |
| ~~1.6~~ | ~~Flag~~ | |
| ~~1.7~~ | ~~Port of Registry~~ | |
| ~~1.8~~ | ~~Classification Society~~ | |
| ~~1.9~~ | ~~Protection & Indemnity Club – full name~~ | |
| ~~1.10~~ | ~~Hull & Machinery insured value~~ | |
| ~~1.11~~ | ~~Date and place of last drydock~~ | |
| ~~1.12~~ | ~~Vessel's Call Sign~~ | |
| ~~1.13~~ | ~~Vessel's INMARSAT number(s)~~ | |
| ~~1.14~~ | ~~Vessel's fax number~~ | |
| ~~1.15~~ | ~~Vessel's email address~~ | |

~~LOADLINE INFORMATION~~

| | | ~~Deadweight~~ | ~~Draft~~ | ~~TPC~~ |
|---|---|---|---|---|
| ~~2.1~~ | ~~Loadline~~ | | | |
| | ~~Winter~~ | | | |
| | ~~Summer~~ | | | |
| | ~~Tropical~~ | | | |
| | ~~Fresh Water~~ | | | |
| | ~~Tropical Fresh Water~~ | | | |
| ~~2.2~~ | ~~Constant Excluding Fresh Water~~ | | | |
| ~~2.3~~ | ~~Freshwater Capacity~~ | | | |

~~TONNAGES~~

| | | | |
|---|---|---|---|
| ~~3.1~~ | ~~Gross Tonnage (GT)~~ | | |
| ~~3.2~~ | ~~Net Tonnage (NT)~~ | | |
| ~~3.3~~ | ~~Panama Canal Net Tonnage (PCNT)~~ | | |
| ~~3.4~~ | ~~Suez Canal Tonnage~~ | ~~Gross (SCGT)~~ | ~~Net (SCNT)~~ |
| ~~3.5~~ | ~~Lightweight~~ | | |

~~DIMENSIONS~~

| | | | | |
|---|---|---|---|---|
| ~~4.1~~ | ~~Number of holds~~ | | | |
| ~~4.2~~ | ~~Hold dimensions~~ | ~~1.~~ | ~~2.~~ | ~~3.~~ |
| | | ~~4.~~ | ~~5.~~ | ~~6.~~ |
| | | ~~7.~~ | ~~8.~~ | ~~9.~~ |
| ~~4.3~~ | ~~Height of holds~~ | | | |
| ~~4.4~~ | ~~Number of hatches~~ | | | |
| ~~4.5~~ | ~~Manufacturer and type of hatch covers~~ | | | |
| ~~4.6~~ | ~~Hatch dimensions~~ | ~~1.~~ | ~~2.~~ | ~~3.~~ |
| | | ~~4.~~ | ~~5.~~ | ~~6.~~ |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL
NYPE 2015 TIME CHARTER

| | | 7. | 8. | 9. |
|---|---|---|---|---|
| 4.7 | Is vessel strengthened for the carriage of heavy cargoes? | | | |
| 4.8 | If yes, state which holds may be left empty | | | |
| 4.9 | Main deck strength | | | |
| 4.10 | Tanktop strength | | | |
| 4.11 | Strength of hatch covers | | | |
| 4.12 | Cubic grain capacity, by hold | 1. | 2. | 3. |
| | | 4. | 5. | 6. |
| | | 7. | 8. | 9. |
| 4.13 | Cubic bale capacity, by hold | 1. | 2. | 3. |
| | | 4. | 5. | 6. |
| | | 7. | 8. | 9. |
| 4.14 | Length overall | | | |
| 4.15 | Length between perpendiculars | | | |
| 4.16 | Extreme breadth (beam) | | | |
| 4.17 | Keel to Masthead (KTM) | | | |
| 4.18 | Distance from waterline to top of hatch coamings or hatch covers if side rolling hatches | No. 1 hatch | Midships | Last hatch |
| | Ballast condition (ballast holds not flooded, basis 50% bunkers) | | | |
| | Full ballast condition (ballast holds flooded, basis 50% bunkers) | | | |
| | Light condition (basis 50% bunkers) | | | |
| | Fully laden condition | | | |
| 4.19 | Vessel's temporary ballast hold(s) | | | |
| 4.20 | Vessel's ballasting time/rate of ballasting | | | |
| 4.21 | Vessel's de-ballasting time/rate of de-ballasting | | | |
| 4.22 | If geared state manufacturer and type | | | |
| 4.23 | Number & location of cranes | | | |
| 4.24 | If vessel has power outlets for grabs – state number and power | | | |
| 4.25 | Maximum outreach of cranes beyond ship's rail | | | |
| 4.26 | Are winches electro-hydraulic? | | | |
| 4.27 | If vessel has grabs on board, state: | | | |
| | Type | | | |
| | Number/Capacity | | | |
| 4.28 | Are holds CO2 fitted? | | | |
| 4.29 | Are holds vessel fitted with Australian type approved hold ladders? | | | |
| 4.30 | Is vessel fitted for carriage of grain in accordance with Chapter VI of SOLAS 1974 and amendments without requiring bagging, trapping and securing when loading a full cargo (deadweight) of heavy | | | |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**NYPE 2015 TIME CHARTER**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | grain in bulk (stowage factor 42 cubic feet) with ends untrimmed? |  |  |  |  |
| 4.31 | Is vessel logs fitted? |  |  |  |  |
| 4.32 | If yes, state number, type and height of stanchions on board and which stanchions are collapsible. Also state number and type of sockets on board |  |  |  |  |
|  | **BUNKERS, SPEED AND CONSUMPTION** |  |  |  |  |
| 5.1 | What type/viscosity of fuel is used for main propulsion? |  |  |  |  |
| 5.2 | Capacity of main engine bunker tanks (excluding unpumpables) |  |  |  |  |
| 5.3 | Number of bunker tanks |  |  |  |  |
| 5.4 | What type/viscosity of fuel is used in the generating plant |  |  |  |  |
|  | Capacity of auxiliary (aux.) engine(s) bunker tanks (excluding unpumpables) |  |  |  |  |
|  | Speed on sea passage | Knots ballast | Knots laden | On tons (main) | On tons (aux.) |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  | Consumption in Port | Tons (main) |  | Tons (aux.) |  |
|  | Working |  |  |  |  |
|  | Idle |  |  |  |  |
|  | **CREW** |  |  |  |  |
| 6.1 | Number of Officers |  |  |  |  |
| 6.2 | Number of Ratings |  |  |  |  |
| 6.3 | Name and nationality of Master |  |  |  |  |
| 6.4 | Nationality of Officers |  |  |  |  |
| 6.5 | Nationality of Ratings |  |  |  |  |
|  | **CERTIFICATE EXPIRY DATES** |  |  |  |  |
| 7.1 | P&I |  |  |  |  |
| 7.2 | H&M |  |  |  |  |
| 7.3 | Class |  |  |  |  |
| 7.4 | Gear |  |  |  |  |
| 7.5 | Document of Compliance (DOC) |  |  |  |  |
| 7.6 | Safety Management Certificate (SMC) |  |  |  |  |
| 7.7 | International Ship Security Certificate |  |  |  |  |

Copyright © 2015 ASBA. All rights reserved. Published by BIMCO and jointly authored by ASBA, BIMCO and the SMF. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org. First published 1913; amended 1921, 1931, 1946, 1981, 1993 and 2015.

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

Clause 58 - Vessel Description
Full description including ECO of MV CS Satira - description as below including vessel communication details - Vessel is with the Head Owners.

**MV CS SATIRA**
37.5 K, BULKER/LOGGER: BAHAMAS FLAG, BUILT 2013
TSUJI HEAVY INDUSTRIES (JIANGSU) CO. LTD., CHINA
FUEL EFFICIENT, NO HEAVY BALLAST IN HOLD, SHALLOW DRAFT, WIDE HATCH BULK CARRIER
ABT 37,693 MT DEADWEIGHT ON 10.2 M SSW
L.O.A. / BEAM 179.9/30.40 METERS
5 HOLDS/HATCHES - END FOLDING HATCH COVERS
4 X 30.5 METRIC TONNES CRANES
GRAIN/BALE 1,639,713/1,574,123 CBFT
AWWF HOLD LADDER FITTED
BOX IN HOLD 2/3/4
CO2 FITTED & A60 BULKHEAD

AT SEA - SPEED AND CONSUMPTION:
LADEN: ABOUT 14 KTS ON ABOUT 22.60 MT/DAY, IFO 380 CST
BALLAST: ABOUT 14 KTS ON ABOUT 20.60MT/DAY, IFO 380 CST

SLOW STEAM FIGURES
LADEN: ABOUT 13.0 KTS ON ABOUT 17.20 MT/DAY IFO
BALLAST: ABOUT 13.0 KTS ON ABOUT 15.68 MT/DAY, IFO
LADEN: ABOUT 12.0 KTS ON ABOUT 13.87 MT/DAY, IFO
BALLAST: ABOUT 12.0 KTS ON ABOUT 12.01MT/DAY, IFO
LADEN: ABOUT 11.0 KTS ON ABOUT 10.91 MT/DAY, IFO
BALLAST: ABOUT 11.0 KTS ON ABOUT  9.11MT/DAY, IFO

GENERATORS:
AT LOADED CONDITION: 2.3 MT/DAY
AT BALLAST CONDITION: 2.3 MT/DAY
AT PORT CONDITION: ABT. 1.7 MT IFO IDLE / ABT. 4.78 MT IFO WORKING (24 HOURS)
AUXILLIARY BOILER:
AT SEA (WINTER): 0.8 MT/DAY
AT PORT: 1.1 MT/DAY

Note: Consumption figures are calculated for HFO of 9,800 KCAL/KG (41,000 KJ/KG)

An additional quantity of 0.2 metric tons of MDO/day as per practice for FO change over, generator starting, incinerator, boiler, etc.

Speed and consumption are given basis up to Beaufort 4, no adverse current and Douglas Sea State 3. Vessel has liberty to use MDO for manoeuvring in narrow waters, canals, rivers, starting engines and on entering/leaving ports and adverse weather or when the generator is on low load. Vessel also has liberty to use MDO/MGO in her main, auxiliary engines & boiler when required by local regulations.

Bunkers supplied to be in accordance with ISO specifications:



Page **1** of **26**

<p style="text-align:center; color:red;">ORIGINAL</p>

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S
CHARTER PARTY DATED 09th JUNE 2021**

VLSFO: ISO 8217: 2005 ISO-F-RMG 380
MDO: ISO 8217:2005 ISO-F DMC sulphur content not exceeding 1.5% statutory limit outside ECA for main engine, generator engine and boiler.
LSGO: ISO 8217:2010 ISO-F DMA maximum 0.1% sulphur content for main engine, generator engine and boiler while in ECA.

No mixing of bunkers allowed.

Additional information (all details about):

Design Uniform Load
Tank top (hold no.1-5): 25 Mt/M2
Hatch cover strength (hold no.1): 3.3 Mt/M2
Hatch covers strength (hold no.2-5): 3.0 Mt/M2
Weather deck (outside line of opening): 5.0 Mt/M2

Details of fuel tanks and capacity:

| Tank | 100% capacity (CBM) |
|---|---|
| Fwd. Deep HFO tk. (c) | : 275 |
| Fwd. Deep HFO tk. (p) | : 250 |
| Fwd. Deep HFO tk. (s) | : 250 |
| No.1 HFO tk. (p) | : 250 |
| No.1 HFO tk. (s) | : 163 |
| LSHFO tk. (p) | : 156 |
| LSHFO tk. (s) | : 81 |
| Total | : 1425 CBM |
| MDO tk. (s) | : 59 |
| MGO tk. (s) | : 58 |
| Total | : 117 CBM |

| | |
|---|---|
| TPC on SSW | : 52.4 |
| Int. GR/NT | : 24,793/12,488 |
| Moulded depth | : 14.75 M |

All figures or details about / ECO's (slow steaming figures) WOG

A) Vessel is fully classed Lloyds highest or equivalent and will remain so throughout this charter.
B) Vessel has cranes in good working order and Charterers have the option to use vessels cranes free of charge.
C) Vessel is without excessive marine growth and in every way capable of performing in line with speed/consumptions as guaranteed. Charterers have the option to conduct underwater survey on delivery to examine vessels hull condition. Should the survey report confirm marine growth on vessels hull then owners to arrange hull cleaning at next convenient port in their time and for their account.
D) Vessel's hatch covers to remain staunch and tight during the currency of this Charter Party.
E) Vessel is fully covered/entered with recognized P&I club (to be advised) and H&M insurance (H&M value to be advised) and will remain so throughout this charter.
F) Vessel shall not be owned, flagged or chartered by any country, person or entity, which would cause violation of or be penalized by US economic sanctions laws.
G) Vessel's speed and consumption is guaranteed upto and including Beaufort 4/Douglas Sea State 3 but eco

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

speeds strictly WOG.

- The vessel shall not change ownership, flag, class, technical and/or crew management from the time of this fixture or during the currency of this Charter Party.

- Owners have provided following certificates:
A. Registration Certificate
B. International Tonnage Certificate or Equivalent
C. Loadline Certificate
D. P and I Cover
E. Document of Compliance
F. Safety Management Certificate
G. Certificate of Class
H. H+M
I. ISSC
J. Baltic Questionnaire

- Owners guarantee that all certificates of the vessel are and will remain valid throughout the whole duration of this charter party.

- Last 3 Cargoes: Anthracite Coal – Nickel Concentrates + Ferro Chrome – Cement in Bags – MOP – Rock Phosphates

- Last 5 Ports: New Orleans – UST - Luga – Pori – Algeciras – Richards Bay

Counterpart and CP Chain
1) Full Style of XO's counterpart including VAT# or equivalent – Satira Shipping Company Limited, Campbell Maritime Centre, 1st Floor, West Bay Street, P.O. Box N-7003, Nassau, New Providence, Bahamas.
2) Banking details where hire is to be paid to: to be provided.
3) Full C/P Chain: Vessel is with the Head Owners.

**Clause 59 - Maintenance**
At time of delivery the Vessel's hull, deck, superstructure, holds, hatchcovers and cargo gear to be in reasonable condition and appearance. Charterers are responsible for damage or staining of cargo holds as a result of cargo and/or cargo operations. Owners to seek Charterers' prior consent for painting cargo holds, which is not to be unreasonably withheld, unless painting performed during dry-docking. Owners confirm that the paint used for Vessel's holds has a grain suitable certificate.

**Clause 60 - In Lieu of Hold Cleaning**
Charterers have the option of redelivering the Vessel unclean on redelivery against payment of lumpsum USD 5,000 excluding removal/ disposal of any dunnage/ lashing/ debris etc. which to be for Charterers time and expense.

Limestone is permitted as the last cargo against USD 7,500 in lieu of hold cleaning excluding the removal of dunnage/ lashing/ debris removal and disposal and scrap last under this Charter Party Charterers to pay Owner in lieu of hold cleaning of USD 15,000 lumpsum and if Petcoke/ Cement/ Sulphur/ Salt/ Clinker as last in lieu of hold cleaning USD 12,000 always excluding dunnage/ lashing/ debris removal & disposal.

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

Any dunnage supplied to the Vessel to be at Charterers entire risk and responsibility. Crew not to perform and/or assist in lashing or unlashing of cargo at any time of this Charter Party.

Any and all lashing material, turn buckles, shackles etc. required to securely lash Charterers cargo is to be supplied in Charterers risk, time and expense. Charterers are to also supply additional lashing material which may be required in case any problems arise with lashings during the voyage. The quantity of additional lashing material to be coordinated with the Master. All lashing material supplied by Charterers is to be considered the property of the Charterers and is to be removed prior the Vessel sailing from the discharge port but latest prior redelivery of the Vessel.

Throughout the currency of this Charter Party and at redelivery the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or lashing material and/or dunnage and/or hold washing water and/or chemicals and detergents and/or waste as defined by MARPOL Annex V, Section 1 or other applicable rules relating to the disposal of such substances.

**Clause 61 - Panama & Suez Canal Transit**
The Vessel shall be fitted for Panama and Suez Canal transit and be in possession of valid necessary certificates on delivery of this Charter in order to comply with current regulations and requirements of both Canal Authorities. The cost of Canal transiting is for the account of the Charterers.

**Clause 62 - Deratting Certificate**
The Vessel shall be delivered with valid Ship Sanitation Control Exemption Certificate ('SSCEC'). However if the Vessel calls a port where the SSCEC cannot be renewed, then Charterers cost and expense for renewal of SSCEC at next suitable port at their time. Vessel not to be off-hired for calling such port which is not approved by World Health Organization for issuance of SSCEC.

**Clause 63 - BIMCO Infectious or Contagious Diseases Clause for Time Charter Parties**
(a) For the purpose of this Clause, the words:

"Disease" means a highly infectious or contagious disease that is seriously harmful to humans.

"Affected Area" means any port or place where there is a risk of exposure to the Vessel, crew or other persons on board to the Disease and/ or to a risk of quarantine or other restrictions being imposed in connection with the Disease.

(b) The Vessel shall not be obliged to proceed to or continue to or remain at any place which, in the reasonable judgement of the Master/ Owners, is an Affected Area.

(c) If the Owners decide in accordance with sub-clause (b) that the Vessel shall not proceed or continue to an Affected Area they shall immediately notify the Charterers.

(d) If the Vessel is at any place which the Master in his reasonable judgement considers to have become an Affected Area, the Vessel may leave immediately, with or without cargo on board, after notifying the Charterers.

(e) In the event of sub-clause (c) or (d) the Charterers shall be obliged, notwithstanding any other terms of this Charter Party, to issue alternative voyage orders. If the Charterers do not issue such alternative voyage orders within forty-eight (48) hours of receipt of the Owners' notification, the Owners may discharge any cargo already

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

on board at any port or place. The Vessel shall remain on hire throughout and the Charterers shall be responsible for all additional costs, expenses and liabilities incurred in connection with such orders/ delivery of cargo.

(f) In any event, the Owners shall not be obliged to load cargo or to sign, and the Charterers shall not allow or authorise the issue on the Owners' behalf of, bills of lading, waybills or other documents evidencing contracts of carriage for any Affected Area.

(g) The Charterers shall indemnify the Owners for any costs, expenses or liabilities incurred by the Owners, including claims from holders of Bills of Lading, as a consequence of the Vessel waiting for and/ or complying with the alternative voyage orders.

(h) If, notwithstanding sub-clauses (b) to (f), the Vessel does proceed to or continue to or remain at an Affected Area:

(i) The Owners shall notify the Charterers of their decision, but the Owners shall not be deemed to have waived any of their rights under this Charter Party.

(ii) The Owners shall endeavour to take such reasonable measures in relation to the Disease as may from time to time be recommended by the World Health Organisation.

Notwithstanding anything else in this Charter Party, if Charterers order the vessel to any port(s), places or countries that are considered as areas where the coronavirus outbreak (Novel Coronavirus (2019- NCOV, COVID-19) has been declared by the World Health Organization, Owners are to undertake and be responsible for the implementation of all relevant measures, as recommended or directed by the World Health Organization and/or local authorities and/or the Vessel's P&I insurer and/ or the Vessel's flag state (as per Baltic Questionnaire attached). All directly related costs, expenses arising out of the Vessel visiting an affected area shall be for Charterers' account and the vessel shall remain on hire throughout. Incase crew is ill/ sick and found to be on account of the Novel Coronavirus, 2019-NCOV, COVID-19 then the vessel will be off hired until ship is back and free from any viruses.

**Clause 64 - Vessel's Cargo Gear**
All cargo handling gear including derricks/ cranes/ winches to be kept in good working order in the event of a breakdown of a derrick (s)/ crane (s)/ winch (es) for any period by reason of disablement or insufficient power, the hire to be reduced pro rata for the time lost due such inefficiency in relation to the number of hatches whose working is actually affected.

Charterers have the option, subject to Owners consent, to employ shore crane(s) as available in order to enable the Vessel to continue working as far as possible by using shore crane (s), and Owners shall reimburse Charterers for the cost of shore crane (s) employed by Charterers with Owners consent in which instance Vessel not to be off hire pro rata in respect of any hatch for which shore gear is employed. The Vessel, is however to be pro-rata off hire if shore cranes are not available during stoppages of a derrick(s)/ crane (s)/ winch (es). All other related extra expenses on Owners account to be capped at stevedore standby time basis one shift only. Charterers warrant that no heavier loads than ship's cranes max lifting capacity are to be used during operations with Vessel's gear. Any breakdown due to stevedore negligence/ mishandling, to be for Charterers account and Vessel not to be placed off hire.

Charterers to instruct Stevedores to use Vessels cranes/ grabs with due care and attention. Should Master find

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

that stevedores rough handling of Vessels gear endangers the equipment, he is to immediately advise Charterers or their agents so that situation may be rectified. If the rough handling continues, he will stop the discharge until crane drivers/ grab operators have been changed, Vessel remaining on hire at all times.

For reasons of safety under no circumstances are more than one post or crane to work any one hold at the same time.

During the duration of this Charter Party, it is explicitly agreed that no tandem lifting operation by Vessel cranes allowed. Should a crane/ grab cargo wire be broken due to rough handling by crane driver/ grab operator or stevedores then the time to replace the wire with a ship's spare to be considered on- hire.

The Vessels cranes/ grabs may only be operated under conditions which are safe for the operations of the cranes/ grabs, and always taking in to consideration the safety of the Vessel.

**Summer Clause for Cranes:**
It is understood that when the ambient temperature is in excess of 43 degrees Celsius the Owners are allowed sufficient time to shut down cranes for cooling to ensure efficient operation, up to maximum 2 hours per day for each crane for which Vessel is not to be off-hired.

**Clause 65 - P&I Club**
Owners guarantee that the Vessel is entered with a Protection and Indemnity (P&I) Association which is a member of the International Group of Protection and Indemnity Clubs and will remain so throughout the duration of the charter. Charterers guarantee that they are insured for P&I risks, including Charterer's Damage to Hull (DTH) throughout the period of this Charter Party.

**Clause 66 - Owner's Agents**
The Owners shall appoint their own agents to attend Owners' matters such as delivery, general average, dry-docking, hospitalization, repatriation of crew, repairs, supply of the Vessel's store and provisions etc., but Charterers' agents will attend to Owners' routine matters such as postage, cash advance, supply of fresh water or similar matters, with Owners paying actual expenses and agency fees or attendance fee if any.

Owners have the option of using Charterers' agents for crew repatriation, stores and provision but same to be settled directly between Owners and Charterers' agents.

**Clause 67 - Dry-Docking**
No dry-docking under this Charter Party unless in case of an emergency or as maybe required but not limited to in case of a stevedores damage/unsafe port/etc.

~~Charterers shall upon receipt of minimum 60 days' notice from the Owners agree to release the Vessel from their employment free of cargo for the purpose of dry-docking. Owners to respect Charterers trading pattern and Charterers to place the Vessel at a range not more than 200 nm from CJK for the purpose of dry-docking not more than 1.5 months prior last acceptable date of dry-dock in accordance with the class of the Vessel. The actual dry-docking place, port to be owner's choice. Vessel is to go off-hire at the time/ place where she deviates from her course and to go on-hire when she is again ready at Charterer's disposal in the same or equidistant position at Charterers option as when she went off- hire. If Vessel is to dry-dock at a port where Charterers are discharging/ bunkering her, then Vessel to go off-hire on leaving discharge/ bunker place and to go on-hire again on leaving dry-dock. All bunkers consumed during off-hire are for account of Owners.~~

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

**Clause 68 - BIMCO Arrest Clause for Voyage Charter Parties 2019**

(a) "Arrest" means the detention, seizure or restraint of the Vessel by order of a Court or government authority. The Owners shall promptly notify the Charterers of any Arrest and keep them informed of the Vessel's status.

(b) In the event of Arrest that is the result of an act, neglect or default of the Charterers, their sub-Charterers, servants or agents, or by any other party connected to the employment of the Vessel under this Charter Party, then the Charterers shall take all reasonable steps to release the Vessel, including and without limitation the provision of security. In the event that the Charterers' security is not accepted, Owners may provide security against the provision of counter-security by the Charterers. All time actually lost thereby shall count as laytime or, if the Vessel is on demurrage, as time on demurrage.

(c) In the event of any other Arrest, then:

(i) The Owners shall take all reasonable steps to release the Vessel, including and without limitation the provision of security;

(ii) Time actually lost shall not count as laytime or, if the Vessel is on demurrage, as time on demurrage;

(iii) Provided that the Vessel is ready to load, the Charterers shall have the right to delay loading cargo until the Vessel is released, and time actually lost as a result of Charterers' decision to delay loading shall count as half laytime or, if the Vessel is on demurrage, as half time on demurrage; and

(iv) Provided that there is no cargo on board and the Vessel has not been released within 14 days of the Arrest, the Charterers shall have the option to cancel the Charter Party by giving written notice, unless security has been provided.

(d) The responsible party under sub clauses (b) or (c) shall indemnify the other party for losses directly arising out of the Arrest that are reasonably foreseeable.

Neither party shall be liable to the other party for any indirect or consequential loss or damage suffered by the other party in connection with the Arrest.

**Clause 69 - Smuggling**

Charterers to be responsible for any fines whatsoever imposed in the event of smuggling by Charterers' employees, servants/ agents or cargo interests but Owners to be responsible for smuggling by the crew. Charterers remain responsible for detention of the Vessel due to smuggling committed by Charterer's employees, servants/ agents or cargo interests.

**Clause 70 - Cargo Exclusions**

Vessel is to carry only lawful merchandise in accordance with the requirements or recommendation of I.M.O., S.O.L.A.S., the competent authorities of the country of the Vessel's registry, Vessel's class, Vessel's flag, ports of shipment, and in accordance with Vessel's Document/ Statement of Compliance for Carriage of Cargo in Bulk and/or its Annexes, and/or Document of Compliance for Ships Carrying Dangerous Goods and/or its Annexes.

None of the cargoes, goods, or substances listed below are to be loading during the currency of this charter: all corrosive, dangerous, explosive and/or combustible, hazardous, inflammable, injurious and toxic substances/ cargoes or goods/ all goods or substances listed in the IMO-IMDG Code-1990 consolidated edition and any subsequent new edition thereof or amendments thereto as well as listed on IMSBC Appendix/ Group B:

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

Acids/ ammonium nitrate/ ammonium nitrate fertilizers except harmless nonhazardous type/ ammonium phosphate/ ammonium sulphate/ aluminum nitrate/ aluminum ferrosilicon/ aluminum dross/ ammunition/ animals/ arms/ asbestos/ asphalt and/ or its products/ ammonio-chlorine/ bitumen/ black powder/ boycott cargoes/ blasting caps/ bones or bone meal/ borax bullion/ calcium nitrate/ calcium carbide/ calcium hypochlorite/ calcium hyper chloride/ calcium oxide/ calcium oxychloride/ cement in bulk/ cement clinker/ castor beans/ calcium oxide/ charcoal/ chipped bone/ cocoa/ coffee/ copra/ corrosives/ cotton and cotton waste/ creosote and creosoted goods/ carbite/ caustic soda/ cottonseed expellers/ dynamite/ direct reduced iron in any form/ iron swarf/ iron oxide/ direct reduced iron ore pellets/ hot briquetted iron/ drugs/ esparto grass/ essential oils/ explosives/ ferrous meal/ ferrosilicon/ firearms/ fire briquettes/ fishmeal/ fish scrap/ ferrous metal/ gaseous coal/ gasoline/ granite blocks and other stone blocks/ hypochlorite solutions/ hides/ jute/ lime/ livestock/ lead nitrate/ loaded bombs/ motor spirit/ manioc/ manioc pellets/ magnesium nitrate/ nefiline syenite/ naphtha/ nitrates/ nuclear substances or fuels/ nuclear cargo/ nuclear waste/ Niger seeds/ nitrate of soda/ nickel ore/ oil cake/ palm kernals/ oily pieces/ oily expellers/ organic peroxides/ petroleum derivatives and all petroleum products/ pitch/ poultry/ Pond coal/ potassium chloride/ potassium nitrate/ petcoke/ pesticides/ pollard pellets/ pyrites/ Prefabricated and mobile buildings/ quebracho/ radioactive substances, products or waste/ rags/ radioisotopes/ resins/ refrigerated cargo/ saltpetre scrap metal in any form including motor blocks, turnings and swarf/ solvents/ sodium nitrate/ specie/ sponge iron/ sulphate in bulk/ sunflower seed expellers and cakes/ tar and all its products/ tea/ tobacco/ waste and old paper/ yachts/ zinc ashes/ zinc dross and residue and all its products/ tea/ tobacco/ TNT/ technical urea/ waste and old paper/ wet hides.

Charterers may lift titanium slag and/or silica sand and/or soda ash and/or zircon sand provided they undertake the risks associated with the stringent hold condition & cleanliness requirements. Should holds fail inspection then time lost and ensuing cleaning costs and any related expenses including any painting/ touch up that may be required for these commodities to be for Charterers' account.

No Deck cargo and cargoes which require welding on board the Vessel. California Block stowage not allowed. ~~All group B cargo not allowed. Potash, Alumina, Feldspar,~~ Fluorspar, Felspar, Soda Ash, and mineral Sands not allowed.

Nickel ore/ Potash/ Alumina Feldspar to be allowed and group B cargo to be allowed but always in line with the loadability of the cargo as per the Vessel certificates.

The Charterers warrant that the concentrates shipped under this charter party are non-hazardous and non-dangerous for carriage according to applicable safety regulations including IMO code(s).

The cargo is to be loaded, stowed, trimmed and discharged strictly in accordance with IMO and local regulations/ department of trade regulations and any other government regulations at ports of call or places of transit. Moisture content of cargo to be within safe limit for sea transport. Certificate relating to moisture content of the concentrates to be handed to master prior loading.

The Charterers shall instruct the Terminal Operators or their servants to load the cargo in accordance with, where appropriate, Annex 9 of the IMO Code of Safe Practice for Stowage and Securing.

Charterers may load (always allowed) 2 dirties including as the last cargo and also including the first intended cargo of 1 scrap cargo from Venezuela subject Owners' approval of due diligence questionnaire.

~~Charterers have the option of carrying in total 2 dirties out of the below but same not to be carried on~~

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09ᵗʰ JUNE 2021**

~~consecutive basis and not as first cargo after delivery and not as last cargo prior to redelivery.~~

Maximum 1 cargoes of scrap
Maximum 1 cargoes of cement or clinker
Maximum 1 cargo of rock salt
Maximum 1 cargo of sulphur as per IMSBC Code Group C
Maximum 1 cargo of petcoke

Following protective clauses to apply:

**Concentrates**
(a) Immediately up on Vessel's fixing for a concentrate cargo both Head Owners P. and I. and Charterers P. & I. to mutually agree on the name of an Independent Sworn Surveyor to be appointed at the port of loading in order to jointly assist Vessel's Master at such port. Specifically to take samples of the intended cargo just before the commencement of loading operations for laboratory analysis/ certificate purposes, evidencing that both the flow moisture point and transportable moisture limit of such cargo are within the limit set out by I.M.O and IMSBC Code.; the above mentioned laboratory to be fully accredited by internationally recognized authorities. The cost of such Independent Surveyor to be shared fifty/ fifty basis.

(b) Such cargo to be loaded, stowed, trimmed and discharged strictly in accordance to latest I.M.O. and/or any other latest regulations/ rules applicable to such cargo.

(c) After loading Charterers undertake to arrange for special extra trimming and/or levelling of the cargo to satisfaction of Master and independent Surveyors appointed by Charterers/ Shippers at their expense and time.

(d) Any directly related extra expenses resulting therefrom/ incurred thereby (such as hold cleaning, holds coating touch up to Masters 'satisfaction/ hold survey etc.) and any detention through any of above causes to be for Charterers 'account.

(e) It is understood that loading terms for loading concentrates to be weather working days. During loading, master has the right to stop loading and close the hatches if the master deems that rain would affects concentrates moisture content. Any such stoppage is not considered to be off-hire under this Charter Party.

**Coke**
(a) Petroleum coke mentioned herein is only limited to the type of non-hazardous, non-dangerous green delayed type and/or calcined type and metallurgical type.

(b) If Charterers exercise such option, Charterers undertake to use holds as less as possible, provided Vessel's stability/ trim and stress permit and provided commercially allowed.

(c) Such cargo to be loaded, stowed, trimmed, discharged strictly in accordance to latest I.M.O. and/or any other latest regulations/ rules applicable to such cargo.

(d) Should any additional/ special wash down of holds before loading be reasonably recommended/ proposed/ required by the Master, Charterers undertake to arrange the same at their time/ expense.

(e) After discharge Charterers to arrange at their expense/ time of any additional/ special wash down of holds carrying such cargo by chemical as Master reasonably considers it necessary. Charterers are allowed to use

ORIGINAL
**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09ᵗʰ JUNE 2021**

ship's Crew to perform cleaning and holds coating touch up as necessary against US$ 800.- per hold used lumpsum besides normal intermediate holds cleaning for dirty cargoes and holds coating touch up, but always provided local regulations permit and all time so used to be for Charterers 'account. Charterers to provide fresh water for cleaning holds.

(f) Any directly related extra expenses resulting therefrom/ incurred thereby (such as hold cleaning, holds coating touch up to Master's satisfaction/ hold survey etc.) and/or any detention through any of above causes to be for Charterers 'account.

**Petcoke Protective Clause**
The petroleum coke mentioned herein is only limited to the type of non-hazardous/ non-dangerous green delayed type and/or calcined type. If Charterers exercise such options, Charterers undertake to use the least number of holds possible, provided Vessel's stability trim and stress permitting. Such cargo to be loaded/ stowed/ trimmed/ discharged strictly according latest IMO and/or any other latest regulations/ rules applicable to such cargo. Should any additional/ special wash down or holds before loading be recommended/ proposed/ required by Master. Charterers undertake to arrange the same at their expense/ time.

Before loading, all holds assigned for petcoke to be applied with hold block by Charterers at their time/ expense risk to satisfaction of master. Additional material for protecting hold bilges drainage (Caustic soda) to be supplied by Charterers.

After discharging Charterers to arrange at their expense/ time any additional special wash down of holds carrying such cargo by chemicals as Master reasonably considers it necessary, however Master and crew to always cooperate with Charterers.

Charterers may request the Vessel's crew to perform hold cleaning paying to Owners lump sum US$ 1,000.00 per hold in addition to regular intermediated hold cleaning fee subject Owners and Vessel shall not guarantee that holds will be sufficiently cleaned / accepted at next loading port, which remain always under Charterers' risk, time and expenses.

**Scrap**
Following Scrap to be allowed, HMS 1+2/ Bonus/ P+S/ Gus A3/ shredded or other similar grades excluding MBT but always in line with the loadability of the cargo as per the Vessel certificates.

(a) The scrap mentioned herein only limited to HMS 1+2 and/or shredded scrap specifically excluding motor blocks and turnings and also metal borings and cuttings.

(b) Charterers undertake that loading of first layer of scrap not to be released until lowered as close as possible to tank-top and not to be dumped/ dropped during loading. First layer of scrap to be loaded at a height and to be evenly stowed/ trimmed to satisfaction of Master before loading balance of cargo.

(c) ~~Charterers undertake to supply on board at their expense, dunnages and/or other materials which are necessary and reasonable to provide safe protection from damage by loading scrap.~~

(d) Prior to loading scrap and immediately after completion of discharge, hold condition survey to be conducted by an independent Surveyor appointed by Charterers in Charterers' time and costs to be shared 50/50 between Owners and Charterers and same to be done immediately after completion of discharge.

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

(e) In case of any damage to the Vessel's Australian hold ladders and any other parts/ places of the Vessel caused by loading such scrap cargo (except for damage to hold plate which to be considered fair wear and tear), Charterers to be responsible for upgrading/repairs to bring Australian hold ladders and other parts/ places to same condition as prior to loading scrap before commencement of next voyage in case needed.

(f) Any directly related extra expenses resulting therefrom/ incurred thereby (such as hold cleaning/ holds coating touch up to Master's satisfaction/ hold survey) and any detention through any of the above causes to be for Charterers 'account.

**Rock Salt**
Charterers are permitted to carry rock salt (whether it be full or part cargo), lime washing, if requested, to be for Charterers' time and expense, however washed sea salt is absolutely not allowed to carry at all events, during the entire currency of period on following conditions:

(a) Charterers undertake to use holds as less as possible, provided Vessel's stability trim and stress permitting.

(b) Before loading, all holds assigned for rock salt to be lime-washed by Charterers at their time/ expense/ risk to the reasonable satisfaction of the Master.

(c) Cargo is to be loaded/ stowed/ trimmed/ discharged strictly according to the latest I.M.O. and/or any other latest regulations/ rules applicable to such cargo.

(d) All fresh water used for irrigation on to rock salt during loading/ voyage/ discharging are for Charterers' accounts.

(e) After discharging Charterers to supply sufficient fresh water at their expense for washing down of all holds.

(f) Any directly related extra expenses resulting therefrom/ incurred thereby (such as hold cleaning, holds coating touch up, to the Master's satisfaction/ hold survey etc.) and any detention through any of above causes are for Charterers 'account.

(g) Charterers are allowed to use ship's Crew to perform lime-washing and removal of same and re-painting as necessary against the payment of US$ 800.- per hold used lumpsum besides normal intermediate hold cleaning, but always subject to prior consent of the Master/ Crew and local regulations permit, and all time so used to be for Charterers 'account. Owners/ Master are not to be responsible for passing hold inspection for loading next cargo and for any consequences whatsoever caused due to such arrangement.

**Steel Slabs**
(a) Charterers are allowed to load steel slabs either from Continent and/or Baltic or Black Sea or Brazil or Mexico or South America or Far East or Persian Gulf, S. Africa and Turkey to discharge U.S.A./ Europe or Far East or South America or India/or U.S.A. or Canada or Mexico, Persian Gulf or Turkey. In the unlikely event of any problems en-route to discharge ports that involve the cargo shifting or becoming unsecured/ unstable, it is clearly understood that the Master has the right to deviate to a nearby suitable port/ place which Master thinks appropriate. Any cost connected with the re-stowage of the cargo to be arranged by the Charterers.

(b) The steel slabs are to be stowed, loaded and discharged strictly in accordance with custom of trade and local regulations, including vertical block any permitted stow if required by Shippers/ Receivers, and cargo is to be properly dunnaged, choked up, lashed and secured to Master's satisfaction at Charterers' risk and expenses.

ORIGINAL
**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

Charterers must supply sufficient dunnage, lashing materials for loading such cargo. No California Block Stowage allowed.

(c) Charterers and/or Shippers and/or Receivers at their expense and time to appoint local Surveyor/ Supercargo at loading port, who is to give assistance/ advice to the Master during loading operation. Owners and Charterers to mutually arrange a survey at both loading and discharging port(s) and cost of same to be equally shared between the Owners and the Charterers, Vessel remaining on hire.

**Steel Loading Clause**
Under all circumstances, the Bills of Lading to be in strict conformity and compliance with Mate's Receipts. In the event that the Vessel is employed to carry steel or steel products during the currency of this Charter Party, master shall ensure that Mate's Receipts are properly and accurately claused. All remarks in the Bills of Lading to be quantified and qualified and no such words as "some" or "any" to be used. Vessel will not be responsible for time and expenses arising from Shippers' and/ or Charterers' refusal to sign Bills of Lading as per this clause. In such case of refusal, Vessel to remain on-hire. These remarks will mirror the condition of the cargo and will be harmonized with P & I surveyors' findings. Owners and Charterers to mutually arrange a survey at both load- and discharging ports and cost of same to be as per below, and Vessel to remain on hire. The Owners and the Master to undertake best efforts to co-operate with the Charterers for the best stowage of cargo. Charterers to provide at their time/ expense all lashings/ securing/ dunnage materials etc. as needed, to Master's satisfaction. Removal of lashing materials/ dunnage/ debris to be done by Charterers, at their time and expense.

**Steel Cargoes Survey**
If steel products are to be carried, Owners should arrange pre-loading survey appointing their P & I surveyor. Cost to be split between Owners and Charterers 50/50.

**Cement Clinker Protective Clause**
(a) Before loading, all holds assigned for cement clinker to be applied with Hold Block plus by Charterers at their time/ expense risk to satisfaction of master, any additional material for protecting hold bilges drainage (caustic soda) to be supplied by Charterers.

(b) Charterers undertake the use least number of holds possible, provided Vessel's stability, trim and stress permitting. Charterers to pay to Owners USD 700 per hold in addition to normal intermediate holds cleaning.

(c) Should any additional/ special wash down of holds before loading be required/ recommended by independent surveyors appointed by Charterers at their expenses, such wash down to be arranged by Charterers at their expense. Incase needed same to be done by Crew.

(d) Any extra expenses resulting therefrom/ incurred thereby and any detention through any of above causes to be for Charterers' account.

(e) Charterers indemnify Owners of all possible cargo solidification, due to hold sweating which is impossible to avoid by proper operation of existing natural ventilation system.

(f) Owners/ master shall not be responsible for the result of hold condition after carrying clinker steel/ steel products always allowed.

**Pig Iron Protective Clause**
Charterers undertake to use holds as few as possible provided Vessel's stability and strength permit.

ORIGINAL
**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

Charterers undertake that loading of first layer of pig iron not to be released until touching tank top and not to be dumped/ dropped during loading so as to provide a cushion flooring for the balance of cargo to Master's reasonable satisfaction. If customary at load port dunnage and or pallets to be used to absorb impact of the first loads. Owners' rights under Clause 42 (Stevedore Damage Clause) are not prejudiced.

**Sulphur Protective Clause**
Charterers undertake to use holds as less as possible, provided Vessel's stability trim and stress permitting. Before loading, all holds assigned for sulphur to be applied with hold block by Charterers at their time/ expense risk to satisfaction of master. Additional material for protecting hold bilges drainage (caustic soda) to be supplied by Charterers.

Cargo to be loaded/ stowed/ trimmed/ discharged strictly according to latest IMO and/or any other latest regulations/ rules applicable to such cargo. All fresh water used for irrigation onto Sulphur during loading/ voyage/ discharging to be Charterers account.

After discharging Charterers undertake thorough cleaning of holds including removal of lime wash coating and supply sufficient fresh water at their expense for washing down of all holds to the satisfaction of Master. Pumps and circuit of the Vessel not to be used for the cleaning. Such cargo not to be last cargo prior to redelivery.

Any extra expense resulting there from/ incurred thereby (such as hold cleaning to Master's satisfactions/ holds survey etc.) and any detention through any of above causes to be for Charterers' account. Charterers are allowed to use ship's crew to perform lime washing and removal of same and re painting as necessary against paying US$ 750.00 per hold besides normal intermediate hold cleaning, but always subject to prior consent of Owners/ Master, crew and local regulations permitting, and all time used to be for Charterers' account. Owners/ Master are not held responsible for passing holds cleanliness for loading next cargo and for any consequences whatsoever caused due to such arrangement. Material to be provided by Charterers.

**Alumina**
Alumina to be allowed provided that prepared/ loaded/ stowed/ trimmed/ carried and discharged strictly in accordance to latest IMO and/or any other latest regulations/ rules applicable to such cargo. In case Vessel's holds do not pass inspection for alumina loading and holds prepared by Vessel's crew, then Owners shall not be responsible for any delay/ expenses and/or any consequences whatsoever. Owners are to never be held in anyway whatsoever responsible for passing the hold readiness survey, either immediately before or immediately after loading alumina. If for any reason whatsoever the holds will be rejected for loading alumina then all expenses and time associated with the additional cleaning/ preparations to bring the holds to the required standards for loading alumina is to be for Charterers account including but not limited to cleaning materials, shore labour should same be engaged and Vessel is to remain always on hire. Any cleaning after discharge including cleaning of deck and accommodations shall be entirely for Charterers account. If the provisions of this clause conflicts with any other clause in the governing Charter Party then this clause shall apply.

**Ammonium Nitrate**
Given that this cargo is under Appendix B of IMSBC Code, is to arrange with Vessel's class for a surveyor, at Charterers' preferred time/ place and at Charterers' time/ expense, and in case class surveyor approves Vessel to carry ammonium nitrate, then same to be allowed. Any extra fittings required for such approval to be for Charterers account. Any loading restrictions imposed by class surveyor to be followed at all times. Attached message from class received overnight in this respect.

ORIGINAL
## ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S
## CHARTER PARTY DATED 09th JUNE 2021

**Bagged Cargo**
All bagged cargoes to be loaded/ tallied/ trimmed/ stowed/ discharged accordingly to IMO/ IMDG regulation. Stowage plan shall always be subject to tank top strength/ availability.

Charterers are to supply/ arrange necessary dunnage/ lashing and cargo separation material. No other cargoes such as, but not limited to machineries to be loaded on top of bagged cargoes. In case of bagged cargoes and bulk cargoes in separate holds, loading cannot be conducted simultaneously.

Master has right to reject any damage bagged cargoes (for e.g. bleeding and or stained bags etc.) at any time during cargo operation and request for collection of split cargo for re-bagging however Owners are not responsible for all bags torn/ short landed/ damaged/ leakage/ pilferage. All bags are to be of water-proof material. In case of bagged cement, Owners are not responsible for any hardening of cement and any cement spillage in the holds after discharge to be chemically cleaned by the Charterers at their expense & time to master's satisfaction.

Owners have the option to appoint Owner's protective cargo tally clerk or pre loading/ discharging surveyor at load/ discharge ports. Such cost to be shared equally between Owners and Charterers against original vouchers. ~~All cargo claims are to be the responsibility of the Charterers, Charterers have P & I cover in place with (Name of Charterers' P & I). Owners/ Vessel shall not be held responsible in any way whatsoever for discharge port(s) claims. Charterers are to indemnify Owners from any/ all claims for cargo shortage(s) and damage that emanate from Receivers, Stevedores and shore-side figures as to cargo (quantity) discharged. Time will continue to count and no deductions from hire shall be allowed for the period of any delays arising as a result of any of the aforementioned claims/ fines/ penalties. In case Vessel is detained by reason of cargo shortage or cargo related claims, the Charterers are to arrange for Vessel's release and/or necessary guarantee and Vessel to remain on hire during such time eventually lost. Any shortage and/or cargo quality claims raised when trading to any African country to be entirely for Charterers account and responsibility notwithstanding the interclub agreement or anything contained herein to the contrary. Sub claims to be defended by Charterers in their time, risk and expense without any recourse or involvement from Owners or their P&I club.~~

## Clause 71 - Gangway Watchmen
Gangway watchmen costs and expenses to be for Owners' account if required by the Owners unless the same is a compulsory, customary in or required by the berth, terminal, port, district or country in which case the cost for the same to be for Charterers' account.

## Clause 72 - Preparation for Loading/ Discharging
Time Charter hire includes the following Crew services as part customary assistance:

(a) All nautical duties necessary for safe navigation day and night, Sundays and Holidays included.

(b) Preparing of Vessel's gear for the loading and discharging operations.

(c) At each port, provided local stevedores regulations permit, opening and closing of hatches before, after and during cargo operation.

(d) Supervision of stowage, loading and discharging operations and putting necessary remarks in Mate's receipt, Timesheet.

Charterers have the option to request from the Owners assistance from the Crew which not to be unreasonably

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

withheld, against payment to the Owners of a crew lump sum bonus which is to be mutually discussed and agreed prior request for the crew's assistance, always subject to local and port labour regulations permitting.

### Clause 73 - Additional Equipment & Fittings

The Charterers shall, subject to the Vessel's class and Owners' approval (which not to be unreasonably withheld) be at liberty, subject to ship's strength and safety, to fit, weld any additional equipment and fitting for loading, discharging and or securing cargo only inside the Vessel holds. Such work shall be done at the Charters' expense and time and the Charterers to remove such equipment and fittings and make good to original condition at their expense and time prior to redelivery, if so required by the Master or the Owners.

Any additional cost including but not limited to the attendance of a PNI surveyor and/or Class surveyor for the purpose of the additional equipment & fitting to be for the Charterers account, risk and time. The Charterers will ultimately be responsible for all damages/ liabilities to the cargo and/or the Vessel that may arise on account of the additional equipment & fittings. Any damage to the Vessel's tank/ hold coating and or paint to be restored by Charterers at their time and expense.

Any damage affecting seaworthiness shall be repaired without any delay before the Vessel sails from the port where such damage was caused or discovered on account of the additional equipment & fitting. Damages affecting the Vessel's trading capabilities shall be repaired prior to redelivery, failing which the Charterers shall be liable for resulting losses. All other damage which is not repaired prior to redelivery shall be repaired by the Owners and settled by the Charterers on receipt of Owners' supported invoice.

### Clause 74 - War Cancellation

If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., Russia, People's Republic of China, Japan, directly affecting the performance of this Charter, both the Owners and the Charterers shall have the option of cancelling this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners, or if she has cargo on board, after discharge thereof at destination, or if prevented from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has not cargo on board, or at the port where she lies, or if at sea at a near and safe port as directed by the Charterers. In all cases hire shall be paid until the Vessel's redelivery which always to be on dropping last outward sea pilot.

### Clause 75 - Late Redelivery

Charterers will not fix the Vessel deliberately to exceed maximum period but due to unforeseen circumstances, should the maximum period be exceeded then Charterers to pay Owners a hire for any such exceeding period equivalent to 115% of the average of the 6 time charter handy size routes presented daily by the Baltic exchange, but in any case not less than the Charter Party hire. In case the same is less than the current hire than Charterers to pay the Owners at a rate of 115% of the current hire, time to count in both cases from the date of completion of the maximum duration of the period and the Vessel to be redelivered in accordance with the Charter Party promptly after completion of the last voyage.

### Clause 76 - Grain Loading

The Vessel is a bulk carrier suitable for discharge by grabs and or rubber evacuator and able to load a full cargo of grain products in bulk in accordance with SOLAS 1974 including trimmed ends and latest amendments to trimming, levelling or cargo securing.

### Clause 77 - Grab Discharge

The Vessel shall be suitable for normal size grab discharge as far as a Vessel of her type/ size is suitable for normal grab size discharge. The Charterers shall have the liberty to only use rubber tires bulldozers in Vessel's

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

holds (without prejudice to Owners rights under the stevedore damage clause contained herein) provided the strength of the Vessel's tank top permits.

**Clause 78 - Hatch Weatherproof Test**
Charterers have the option to perform hose test at their own expense. In case vessel fails such survey owners to rectify the same at their own time and cost and also time of the subsequent test/s to be for owners account.

**Clause 79 - Change of Political Situation**
Should the political Situation change in any of the excluded countries mentioned in Clause 89, Owners will consider trading to such excluded country on a case by case basis. In any case, any additional premium charged by Owners' Underwriters and/ or any additional insurance or security requirement to call the country considered is to be for Charterers' account.

**Clause 80 - Cable, Entertainment & Victualling**
Charterers to pay a lumpsum of USD 1,500 (One Thousand Five Hundred United States Dollars) per month or pro rata for all victualing/ gratuities and cost of cables.

**Clause 81 - Fresh Water**
Fresh water consumed under this Charter for domestic purposes to be for Owners' account and fresh water consumed by stevedores and or for the purpose of hold cleaning to be for Charterers' account.

**Clause 82 - BIMCO Double Banking Clause**
(a) The Charterers shall have the right, where and when it is customary and safe for Vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another Vessel or Vessels of any size or description whatsoever or to order such Vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment including adequate and proper tyres and Yokohama Fenders to Master's satisfaction as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations. If Charterers' equipment are to be placed on board, then weight of same not to exceed safely working load Vessel's deck/ hatchcovers strengths.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

**Clause 83 - I.T.F.**
Owners confirm Vessel is ITF certified. Owners also guarantee that the minimum terms and conditions of employment of the Crew of the Vessel are now and will remain for the period of the Charter Party, covered by

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S
CHARTER PARTY DATED 09ᵗʰ JUNE 2021**

an ITF agreement or a bona fide Trade Union Agreement acceptable to the ITF.

### Clause 84 - Safe Stowage and Trimming

Charterers are to load, stow, dunnage, undunnage, lash, unlash, secure, tally, weigh and discharge the cargoes throughout this Charter Party and are to leave the Vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnage and secured to the Master's satisfaction for all shifting between berths and all passages between ports under this Charter in their time, risk and at their expenses.

### Clause 85 - Asian Gypsy Moth Clause

(a) The Owners shall deliver the Vessel free of Asian Gypsy Moth (AGM). If the Vessel has within the last twenty-four (24) months prior to delivery traded to an area where there is a risk of infestation by AGM, the Owners shall, on delivery, provide an inspection certificate stating that the Vessel is free from infestation by AGM issued by an appropriate and recognised certification body (an AGM Free Certificate) dated no earlier than the date of departure from the last port of call in such area.

(b) Should the Charterers order the Vessel to an area where there is a risk of infestation by AGM, the Charterers shall take all reasonable steps at their expense to mitigate the risk of infestation. If infestation should nevertheless occur, the Charterers shall ensure that such infestation is removed from the Vessel. Without prejudice to this obligation, the Charterers shall provide an AGM Free Certificate from the last port of call in the aforementioned area. Notwithstanding the issuing of such a certificate, should an infestation of AGM be found or suspected, the Charterers shall be responsible for any consequences whatsoever, including but not limited to costs and third-party liabilities. The Vessel shall remain on hire throughout.

(c) The Charterers shall redeliver the Vessel free of AGM. If the Vessel has traded to an area where there is a risk of infestation by AGM the Charterers shall, on redelivery, provide an AGM Free Certificate dated no earlier than the date of departure from the last port of call in such area.

### Clause 86 - Ballast Water Exchange Regulation

If ballast water exchanges are required by any coastal state and/or independent state where Vessel is trading, the Owners/ master shall comply with same at charterer's time, risk and expense.

### Clause 87 - Trading Exclusions

Trading via safe port(s)/ safe berth(s)/ safe anchorage(s), always afloat as per C/P and always within Institute Warranty Limits/ International Navigating Limits however, Charterers' option to break Institute Warranty Limits/ International Navigating Limits against paying additional premium not exceeding what would be charged if vessel was insured by Lloyds of London and always net of all rebates but always to the Owners' option to allow this breach of Institute Warranty Limits/ International Navigating Limits. Charterers' option NAABSA as per C/P.

Trading to any of these countries not to prejudice the Vessel's P&I cover and H&M insurance and will not contravene any sanctions imposed by the UN, the USA or the EU, or Switzerland, whether currently in force or coming into force during the duration of this charter and is always in conformity with Piracy, Wartime, BIMCO or other similar clauses, and Vessel will always trade within IWL/ INL.

North Korea, C.I.S Pacific ports, Turkish occupied Cyprus, Cambodia, Crimea, Sudan, Israel, Libya including Gulf of Sidra/ Sirte, Cuba, Great Lakes, Iran, Iraq, Syria, St. Lawrence and the Sea of Azov between 10 December and 10 May are always excluded. All war/ warlike zones which to be determined by Lloyd's underwriters of London, and closed/ UN, US (OFAC) and EU sanctioned areas, Ethiopia, Eritrea, Somalia, Congo, Orinoco and Amazon river. Any other places which Vessel is from time to time prohibited to call by the national authorities under which the

ORIGINAL
**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S
CHARTER PARTY DATED 09th JUNE 2021**

Vessel is registered.

If Charterers require to call warlike zones then same to be subject to the CONWARTIME 2013 as amended and as contained in the Charter Party. Basic war risk insurance to be for Owners' account. Extra war risk insurance maximum as quoted by Lloyds of London, including blocking and trapping if applicable, and crew war bonus to be payable by the Charterers.

Owners agree all Japanese/ South Korean/ Chinese ports included in trading provided Charterers will obtain prior sailing each Japanese/ South Korean/ Chinese port of call phytosanitary certificate in high risk season for Asian gypsy moth in strict accordance with Australia to Canada and USA ports/ waters regulations. In case Vessel banned from Canada/ USA/ Australia ports/ waters due Asian Gypsy Moth reasons, or because of calling Japanese/ South Korean/ Chinese ports, Vessel to remain on-hire and any expenses, fumigation required to be for Charterers' account. Trading India/ PG (excluding Iran)/ Pakistan are allowed basis conditions prevailing on charter party date. No direct calls between People's Republic of china and Taiwan.

Trading to Yemen not permitted.

Owners to allow 1 single call to Venezuela.

**Clause 88 - Pre-Loading Survey**
**Cargo Surveys:**
For steel cargos - In the event Charterers load finished steel products they will tender notice to Owners prior to such loading in order Owners to arrange for a pre-loading survey on the cargo to be loaded. The cost of such a survey will be equally shared by the Charterers and Owners.

**For Fertilizers and bagged rice:**
Joint survey for monitoring of cargo quality/ quantity to be arranged and costs to be shared equally between Owners and Charterers at load and discharge ports.

**Clause 89**
Any shortages will be established basis draft survey and may be made by independent surveyor nominated on behalf of Charterers, Receivers or sub-Charterers. Master to co-operate fully with surveyor's requirements in order to take the survey. Owners is in no way responsible for shore/ tally survey.

**Clause 90**
Charterers undertake that during the period of this time Charter they will not procure any suppliers, necessaries or services, including port expenses and bunkers on the credit of the Owners or in owner's name but that these will always be procured in the name of the Charterers and shall always remain the responsibility of the Charterers and relevant invoice will be stamped accordingly.

(a) The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien, any encumbrance, or any rights of any kind whatsoever over the Vessel in respect of the supply of bunkers.

(b) The Charterers shall:

Prior to ordering any bunkers for the Vessel inform the sellers of the bunkers in writing (the "Non- Lien Notice") that the bunkers to be supplied to the Vessel are solely for the Charterers' account, and that neither the Vessel, the Owners nor the Master is a party to the bunker supply contract and no lien, encumbrance or any rights shall

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

arise on the Vessel; and

After ordering bunkers inform the Owners in writing of the name and contact details of the sellers of the bunkers and, if the Owners so request, provide Owners with a copy of the Non-Lien Notice.

(c) If the Charterers fail to comply with sub-clause (b) (ii), the Master shall be entitled to refuse to allow the bunkers to be supplied to the Vessel and if the Master so refuses hire shall continue to accrue and any extra expenses arising out of or in connection with such refusal shall be for the Charterers' account.

(d) If in compliance with any of the provisions of this Clause, anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party by the Owners.

(e) As soon as possible after the due date of payment for bunkers for each supply made during the charter period, the Charterers shall provide the Owners with written evidence or acknowledgement of payment from the bunker sellers.

(f) The Charterers shall procure that this Clause shall be incorporated into all sub-time charters.

**Clause 91**
In case of multi-port/ multi receivers then Owners no to be responsible for the distribution of cargo splits between ports/ receivers. The master will follow Charterers orders as best possible for correct cargo distribution. Any cargo separations required, Other than natural separations, shall be for Charterers' account/ time/ responsibility, Owners not to be responsible for any mixture and/ or contamination of the cargo.

The Owner is only responsible for the total quantity of the cargo on board as per the draft survey and not the individual Bill of Lading quantities and or quality.

**Clause 92**
For trading Nigeria - Charterers to arrange and pay for NPA/ SEN. If NPA/ SEN is not obtained prior Vessel is entering Nigerian territorial waters, then Charterers to remain responsible for all costs/ consequences/ damages with Vessel remaining on hire.

**Clause 93 - BIMCO Bulk Carrier Safety Clause**
(a) The Charterers shall instruct the Terminal Operators or their representatives to co-operate with the Master in completing the IMO Ship/ Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) The Charterers shall instruct the Terminal Operators to load/ discharge the Vessel in accordance with the loading/ discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.

**Clause 94**
In case of Vessel's call at California Charterers to take into consideration the regulations for the fuel oil controls by CA. the requirements are specified in section 2299.1 title 13 and section 93118 title 17, California Code of Regulations.

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09ᵗʰ JUNE 2021**

1. The following fuel oils shall be used by auxiliary diesel engines and diesel-electric engines on ocean going Vessels while these engines are operating within the regulated California waters i.e. (is a zine of California's coast that is approximately 24 nautical miles offshore starting at the California- Oregon border end ending at the California- Mexico border).

Marine gas oil (DMA) or marine diesel oil (DMB) at or below 0.5% sulphur (application starts on 1 January 2007) or at or below 0.1 % depending on applicable regulations and Charterers to always comply with the ECA rules and regulations that may come into force or during the currency of the charter party including and IMO regulations.

**Clause 95 - BIMCO Radioactivity Risk Clause for Time Charter Parties**
(a) The Vessel shall not be obliged to proceed or required to continue to or through or remain at, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which may expose the Vessel, her cargo, crew or other persons on board the Vessel to danger from levels of ionizing radiations from or contamination by radioactivity from any nuclear fuel, nuclear waste or from the combustion of nuclear fuel, or the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or component thereof (hereinafter "Radioactivity") determined by a competent local, national or international authority (including but not limited to the International Atomic Energy Authority and the World Health Organization) to be harmful to human health.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through or remain in the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of waiting for or complying with such orders shall not be considered off-hire.

(c) The Vessel shall have liberty to comply with all orders, directions, recommendations or advice of competent authorities and/or the Flag State of the Vessel in respect of arrival, routes, ports of call, destinations, discharge of cargo, delivery, or in any other way whatsoever.

(d) The Charterers warrant that they shall not load cargoes and/ or empty containers and/or supply bunkers that have levels of radioactivity in excess of normal background radiation levels for the Area. The Owners, at their discretion, may arrange for a radioactive survey by an independent qualified surveyor, at the Charterers' cost, expense and time. If the level of Radioactivity in the cargoes, empty containers and/or bunkers is determined by the surveyor to exceed normal background levels, the Owners shall have the right to refuse to load such cargoes, empty containers and/ or bunkers.

(e) Any delays arising out of measures taken by port authorities to screen the Vessel for radiation either in the countries affected by radioactivity or at subsequent ports of call shall be for the Charterers' account. Any time lost as a result of complying with such screening shall not be considered off- hire.

(f) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

**Clause 96**
When Vessel trading U.S.A. port(s), Owners/ Vessel to comply with ENOA/D regulations. Any eventual delays/

<p style="text-align:center;color:red;">ORIGINAL</p>

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

costs caused by non-compliance of same by Vessel/ Owners to be for Owners account.

Charterers' agents to assist master in respect of submitting ENOA/D etc. without charging extra fees to Owners.

**Clause 97 - JWC Clause**
Notwithstanding anything else in this Charter Party it is understood and agreed that the current (at time of fixing) list of areas/ countries under the joint war committee hull war strikes, terrorism and related perils (JWC list) has been reviewed and accepted by Owners as allowed trading places for which Charterers are to pay the extra war risk premium and crew war bonus if applicable.

Any new area(s)being added to the list (JWC list) after the Vessel's fixture has been concluded to be reviewed immediately by Owners and Owners to provide Charterers with full co-operation unless Vessel's leading hull underwriters have specifically excluded the specific area from trading even against any additional war risk premium. Notwithstanding the above it is understood that Iran, Syria, Libya, Israel, Somalia, and Iraq always to be excluded.

**Clause 98**
The Bills of Lading issued under this Charter Party, in addition to the Clauses listed at Clause 33, shall incorporate VOYWAR 2013 to apply to Bills of Lading, BIMCO's General Average Clause and the U.S.A. Clause Paramount or the Canadian Clause Paramount as applicable under the trade. It is expressly agreed that Canadian Clause paramount will apply only for Canada and Charterers will indemnify Owners for any liabilities over and above the Hague Visby Rules.

**Clause 99 - NAABSA Clause**
The Vessel shall be loaded and discharged in any safe dock or at any safe berth or place that Charterers or their agents may direct, provided the Vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size Vessels to safely lie aground.

That the cargo or cargoes be laden and/ or discharged in any dock or at any wharf or place that Charterers or their Agents may direct, provided the Vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size Vessels to safely lie aground.

Always subject to the Owners' approval, which is not to be unreasonably withheld, the Vessel during loading and/ or discharging may lie safely aground at any safe berth or safe place where it is customary for Vessels of similar size, construction and type to lie, if so requested by the Charterers, provided always that the Charterers have confirmed in writing that Vessels using the berth or place will lie on a soft bed and can do so without suffering damage. The Charterers shall indemnify the Owners for any loss, damage, costs, expenses, or loss of time, including any underwater inspection required by Class, caused as a consequence of the Vessel lying aground at the Charterers request. Such safe ports/ places to be limited to Argentina including Plate River, Buenaventura, South Brazil (Not North of Vitoria) and always excluding Amazon River.

**Clause 100 - General Average**
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994 or any subsequent modification thereof, in London unless another place is agreed in the Charter.

Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the above clause.

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

**Clause 101 - U.S.A. Clause Paramount**
This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or Immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in custody of the Carrier.

The Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier.

**Clause 102 - Canadian Clause Paramount**
All the terms provisions and conditions of the Canadian Carriage of Goods by Water Act, and of the Rules in force thereunder are, so far as applicable, to govern the contract contained in this Bill of Lading and the Carrier is to be entitled to the benefit of all privileges, rights and immunities contained in such act and of the Rules in force thereunder as if the same were herein specifically set out. If anything herein contained be inconsistent with the said provisions it shall to the extent of such inconsistency and no further be null and void.

The Carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and wheresoever occurring when such loss or damage arises prior to the loading on and/or subsequent to the discharge from the Carrier's ship.

**Clause 103 - BIMCO Sanctions Clause for Time Charter Parties 2020**
(a) For the purposes of this Clause:

"Sanctioned Activity" means any activity, service, carriage, trade or voyage subject to sanctions imposed by a Sanctioning Authority.

"Sanctioning Authority" means the United Nations, European Union, United Kingdom, United States of America or any other applicable competent authority or government.

"Sanctioned Party" means any persons, entities, bodies, or Vessels designated by a Sanctioning Authority.

(b) Owners warrant that at the date of this Charter Party and throughout its duration they, the registered Owners, bareboat Charterers, intermediate disponent Owners, managers, the Vessel and any substitute are not a Sanctioned Party.

(c) Charterers warrant that at the date of this Charter Party and throughout its duration they and any sub-Charterers, shippers, receivers and cargo interests are not a Sanctioned Party.

(d) If at any time either party is in breach of sub-clause (b) or (c) above then the party not in breach may terminate and/or claim damages resulting from the breach.

(e) Charterers shall not give any orders for the employment of the Vessel which involves a Sanctioned Party or a Sanctioned Activity.

(f) If the Vessel is already performing an employment which involves a Sanctioned Party or is a Sanctioned Activity, without prejudice to any other rights that may be available in sub-clause (d) above, Owners shall have

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

the right to refuse to proceed with the employment and Charterers shall be obliged to issue alternative voyage orders within forty-eight (48) hours of receipt of Owners' notification of their refusal to proceed. If Charterers do not issue such alternative voyage orders Owners may discharge any cargo already loaded at any safe port or place (including the port or place of loading). The Vessel shall remain on hire throughout and Charterers shall be responsible for all additional costs and expenses.

(g) If in compliance with sub-clause (f) above anything is done or not done, such shall not be deemed a deviation, but shall be considered due fulfilment of this Charter Party.

(h) Charterers shall indemnify Owners against any and all claims brought by the Owners of the cargo and/or the holders of Bills of Lading, waybills or other documents evidencing contracts of carriage and/or sub-Charterers against Owners by reason of Owners' compliance with such alternative voyage orders or discharge of the cargo in accordance with sub-clause (f) above.

(i) Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading, waybills or other documents evidencing contracts of carriage issued pursuant to this Charter Party.

**Clause 104 - Epidemic Clause**
See Infectious Disease Clause at Clause 63 Above.

**Clause 105 - Bonus/ Fines Payments**
Any fines and/or bonus payments and/or other delays/ charges, which are particularly common in Black Sea ports, Argentina, Brazil and Thailand and which come about as a result of Charterers and/or their agents and/or their surveyors contravening national/ international/ local regulations and/or Owners policy, shall be for Charterers time and account.

In case master is approached for any of the payments referred to above, master shall immediately notified Charterers in writing and upon which, Charterers will take this matter up directly with their local agents or correspondence and the Vessel to continue to remain on hire.

**Clause 106 - Cancelling Clause**
(a) Should the Vessel not be ready to deliver on the agreed cancelling date, the Charterers shall have the option of cancelling this Charter Party.

(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to deliver by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to deliver and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.

(c) Such option must be declared by the Charterers within 24 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the date of Owners' notification to the Charterers shall be the new cancelling date.

(d) The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause of this Clause.

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

### Clause 107 - BIMCO Anti-Corruption Clause for Charter Parties

(a) The parties agree that in connection with the performance of this Charter Party they shall each: comply at all times with all applicable anti-corruption legislation and have procedures in place that are, to the best of its knowledge and belief, designed to prevent the commission of any offence under such legislation by any member of its organization or by any person providing services for it or on its behalf; and

Make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions in connection with this Charter Party.

(b) If a demand for payment, goods or any other thing of value ("Demand") is made to the Master or the Owners by any official, any contractor or sub-contractor engaged by or acting on behalf of Owners or Charterers or any other person not employed by Owners or Charterers and it appears that meeting such Demand would breach any applicable anti-corruption legislation, then the Master or the Owners shall notify the Charterers as soon as practicable and the parties shall cooperate in taking reasonable steps to resist the Demand.

(c) If, despite taking reasonable steps, the Demand is not withdrawn, the Master or the Owners may issue a letter of protest, addressed or copied to the Charterers. If the Master or the Owners issue such a letter, then, in the absence of clear evidence to the contrary, it shall be deemed that any delay to the Vessel is the result of resisting the Demand and (as applicable):

The Vessel shall remain on hire; or

Any time lost as a result thereof shall count as lay time or (if the Vessel is already on demurrage) as time on demurrage.

(d) If either party fails to comply with any applicable anti-corruption legislation it shall defend and indemnify the other party against any fine, penalty, liability, loss or damage and for any related costs (including, without limitation, court costs and legal fees) arising from such breach.

(e) Without prejudice to any of its other rights under this Charter Party, either party may terminate this Charter Party without incurring any liability to the other party if at any time the other party or any member of its organization has committed a breach of any applicable anti-corruption legislation in connection with this Charter Party; and

Such breach causes the non-breaching party to be in breach of any applicable anti-corruption legislation.

Any such right to terminate must be exercised without undue delay.

(f) Each party represents and warrants that in connection with the negotiation of this Charter Party neither it nor any member of its organization has committed any breach of applicable anti-corruption legislation. Breach of this sub-clause (f) shall entitle the other party to terminate the Charter Party without incurring any liability to the other.

### Clause 108 - Insolvency Clause

Both Owner and Charterer agree that if at any time during the Charter Party a bankruptcy event occurs in relation to the Owner or the Charterer and/ or any of its affiliates (the "Defaulting Party") the other party (the "Non-Defaulting Party") may exercise the option to terminate the Charter Party at any time by giving 5 calendar days' notice (the "Termination Notice") to the Defaulting Party. A Termination Notice shall be valid if sent by e-

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

mail. Following service of a Termination Notice the Charter Party shall terminate on the given date (the "Termination Date"). As at the Termination Date all performance obligations of both the Defaulting and Non-Defaulting Party shall terminate. Termination of the Charter Party in accordance with this clause is without prejudice to and shall not affect any rights, accrued or otherwise, that either party may have against the other.

For the purposes of this clause a "Bankruptcy Event" shall have occurred if a party:

(a) Institutes a proceeding seeking any relief or protection under any bankruptcy or insolvency law

(b) Has instituted against it a petition for its winding up or liquidation and which is not dismissed or discharged within 30 days of the date of petition

(c) Has an administrator, receiver or equivalent appointed over its assets

(d) Enters into a scheme, arrangement or plan with or for the benefit of its creditors

(e) Is subject to a reorganization under any bankruptcy or insolvency laws, or

(f) Is subject to an event in any jurisdiction which has a similar effect to any of the events listed in (a)-(e) above.

**Clause 109 - BIMCO Solid Bulk Cargoes that can Liquefy Clause for Charter Parties**
(a) The Charterers shall ensure that all solid bulk cargoes to be carried under this Charter Party are presented for carriage and loaded always in compliance with applicable international regulations, including the International Maritime Solid Bulk Cargoes (IMSBC) Code 2009 (as may be amended from time to time and including any recommendations approved and agreed by the IMO).

(b) If the cargo is a solid bulk cargo that may liquefy, the Charterers shall prior to the commencement of loading provide the ship's Master, or his representative, with all information and documentation in accordance with the IMSBC Code, including but not limited to a certificate of the Transportable Moisture Limit (TML), and a certificate or declaration of the moisture content, both signed by the shipper.

(c) The Owners shall have the right to take samples of cargo prior to loading and, at Charterers' request, samples to be taken jointly, testing of such cargo samples shall be conducted jointly between Charterers and Owners by an independent laboratory that is to be nominated by Owners. Sampling and testing shall be at the Charterers' risk, cost, expense and time. The Master or Owners' representative shall at all times be permitted unrestricted and unimpeded access to cargo for sampling and testing purposes. If the Master, in his sole discretion using reasonable judgment, considers there is a risk arising out of or in connection with the cargo (including but not limited to the risk of liquefaction) which could jeopardize the safety of the crew, the Vessel or the cargo on the voyage, he shall have the right to refuse to accept the cargo or, if already loaded, refuse to sail from the loading port or place. The Master shall have the right to require the Charterers to make safe the cargo prior to loading or, if already loaded, to offload the cargo and replace it with a cargo acceptable to the Master, all at the Charterers' risk, cost, expense and time. The exercise by the Master of the aforesaid rights shall not be a breach of this Charter Party.

(d) Notwithstanding anything else contained in this Charter Party, all loss, damage, delay, expenses, costs and liabilities whatsoever arising out of or related to complying with, or resulting from failure to comply with, such regulations or with Charterers' obligations hereunder shall be for the Charterers' account. The Charterers shall indemnify the Owners against any and all claims whatsoever against the Owners arising out of the Owners

ORIGINAL

**ADDITIONAL CLAUSES TO MV "CS SATIRA" / XO SHIPPING A/S**
**CHARTER PARTY DATED 09th JUNE 2021**

complying with the Charterers' instructions to load the agreed cargo.

(e) This Clause shall be without prejudice to the Charterers' obligations under this Charter Party to provide a safe cargo. In relation to loading, anything done or not done by the Master or the Owners in compliance with this Clause shall not amount to a waiver of any rights of the Owners.

**Clause 110 - MARPOL Annex VI**
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall apply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

(b) The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

(c) The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-clause (a). Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-clause (a), the Owners warrant that:

(d) The Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

(e) Subject to having supplied the Vessel with fuels in accordance with sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(f) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/ or zones regulated by regional and/ or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**Clause 111 – Private & Confidential**
Negotiations and fixture if any to be kept strictly private and confidential.

**********

