# EXHIBIT E

**GLOBAL AMERICAN TRANSPORT LLC**
77 WEST WACKER DRIVE, 45 TH FLOOR
CHICAGO, ILLINOIS, 60601, USA
T: +1 312 3129593 (24HRS)
E: OPS@GATRANSPORTLLC.COM
W: WWW.GATRANSPORTLLC.COM

ATTN: Mr Leonidas Kyrris

MFB

Fishmongers' Chambers
1 Fishmongers' Hall Wharf
London EC4R 3AE

**OUR REF:**          BRT/1131/2598342

30 April 2024

JBurrows@m-f-b.co.uk

Dear Sirs,

**MV "CS SATIRA" - C/P DD 07.07.2023 - BUNKER DISPUTE**

1. We are the London lawyers for Satira Shipping Company Limited, Owners of the MV CS Satira and their FDD insurers, Brittania. Please direct all correspondence in connection with this matter to us directly moving forward.

2. Owners and the Club have passed us their files on the disputes arising out of the Charterparty, and their recent exchanges with Charterers.

3. We refer to Charterers' email sent to Britannia on **28 March 2024**, and adopt the same sub-headings as used therein.

**Redelivery Dispute**

4. There can be no doubt, and it appears not to be disputed, that Charterers redelivered the Vessel at Zhoushan anchorage in breach.

5. The question then is solely: what are Owners recoverable losses arising from the breach?

6. The English law position on the proper measure of damages for redelivery in the wrong place, is set out by the authors of Time Charters at 15.9 (attached for your ease of reference). The proper measure is:

Tel: +44 (0)20 7330 8000 Fax: +44 (0)20 7256 6778
E-mail: mail@m-f-b.co.uk Website: www.m-f-b.co.uk

• Balvinder Ahluwalia • Kevin Cooper • Martin Dalby • Peter Gercans • Edward Gray • Ian Hawkes • Andrew Hughes •
• Simon Johnson • Ingolf Kaiser • Matthew Montgomery • Asad Naqvi • Baris Oztoprak • Andrew Powell • Eduardo Prim •
• Mark Seward • Jonathan Steer • Jonathan Watson • Nick Wilson • Vaughan Wise-Dolpire • Simon Wolsey • Charlie Young •

Regulated by the Solicitors Regulation Authority: MFB Solicitors 00068410

> *"Where the charterers redeliver in the wrong place, it has been held that the proper measure of damages is **the profit that the owners would have made on a final voyage to the agreed redelivery place**"*

7. Had Charterers redelivered the Vessel in the correct place, Owners would have earned hire for a further 1.4272 days, totalling **USD 13,049.64.**

8. Charterers reject Owners' claim, because they say Owners suffered no loss as a result of their breach. That is because, Charterers say, the Vessel was redelivered at a place that was more advantageous to Owners, considering the Vessel's scheduled dry dock at Shanghai.

9. This analysis is incorrect for the following two reasons:

    (1) The approach is wrong as a matter of law. The correct measure of Owners' loss, arising from Charterer's failure to redeliver in the correct place, is well established (see Paragraph 6 above) and it does not involve an inquiry as to what Owners' future plans for the Vessel were beyond redelivery.

    (2) It is also wrong as a matter of fact. Owners did suffer a loss as a result of Charterers' breach. There were no berths available to dry dock the Vessel until **17 October** and so no gain to be made by the Vessel remaining at anchorage nearer to dry dock from **12 October** onwards. By redelivering at Zhoushan, Owners lost out on hire that otherwise should have been earned.

10. We note that Charterers have made a **USD 20,000** deduction from their FHS. Charterers argue that this credits them for the advantage Owners gained as a result of Charterer's breach, in redelivering in the wrong place.

11. Charterers will of course be fully aware that this deduction has absolutely no basis in law, whatsoever. If they are not currently aware, then they shortly will be when advised by their FDD insurers or instructed lawyers.

12. For the avoidance of doubt, Charterers' deduction of **USD 20,000** is rejected in full.

**ILOHC**

13. In their FHS, Charterers have failed to account for the **USD 10,000** ILOHC as per Clause 9 of the Charterparty.

14. This is based on a misconceived notion that the terms of the Addendum agreed on **19 August,** in effect, replaced Clause 9 of the Charterparty recap.

15. The purpose of Clause 9 is clear, where Charterers do not redeliver the Vessel with clean holds, following carriage of permissible cargoes, Owners are compensated by a fixed amount; **USD 10,000**.

16. The Addendum addresses entirely separate issues, namely:

    (1)  Charterers' permission to carry a dirty cargo.

    (2)  The CP duration.

17. It is notable then when Owners first offered terms, to facilitate Charterers' request, Owners framed the payment of "60k" as covering any <u>additional</u> hold cleaning. I.e. holding cleaning beyond the ordinary level of cleaning as envisaged by Clause 9.

18. It is also notable that, when Charterers counteroffered, they referred to the payment of USD35k as a "bonus". In other words, something entirely separates to ILOHC which is, in effect, liquidated damages for failure to return the vessel in like good order and condition.

19. Finally, and most importantly, it is clear from the words the parties used to record the terms of the Addendum, that any payment was intended to be additional to the payment of ILOHC. In that regard, the relevant wording is repeated for ease of reference:

    *"Extra lumpsum: 45k additional lumpsum to cover any additional hold cleaning and associated costs incurred by Owners."*

20. The repeated use of the words "extra" and "additional" make it abundantly clear that the parties intended the **USD 45,000** to be in addition to the payment of ILOHC. Any other interpretation of the Addendum would render "extra" and "additional" meaningless.

21. By contrast, the absence of any reference to "replace", greatly undermines Charterers' position that the Addendum was intended to replace the effect of Clause 9 of the recap.

22. Owners maintain their position that ILOHC of **USD 10,000** must be paid as per Owners' FHS.

**Bunker Quantities Dispute**

23. Owners' position regarding this head of claim has been set out in detail per the Club's email dated **21 March 2024**, which was drafted on our advice.

24. Charterers appear to miss the essential point. During this Charterparty, Charterers took over and used Owners' bunkers without paying for them.

25. When the Vessel was redelivered short bunkers, in breach, Owners' loss was the value of their bunkers that Charterers used without replacing. Charterers' position on this is entirely incorrect, and their approach only relevant to a situation where Owners are to take over and pay for the bunkers ROB on redelivery. We are not concerned with that situation here.

26. We agree with Charterers that the quantity of shortfall bunkers needs to be determined. We are also broadly in agreement with Charterers in terms of how that is done:

    *"The shortfall is the difference in quantity between the agreed redelivery quantity and the actual redelivery quantity".*

27. Charterers rely on the phrase "about" contained within the relevant CP provision, to give themselves the benefit of a 5% margin on redelivery quantities. In summary, Charterers position is that they were only obliged to redeliver with:

    (1) 547.105MT of IFO, and

    (2) 139.65 MT of MGO

28. Leaving a contractual shortfall of:

    (1) 30.548MT of IFO

    (2) 26.748 MGO

29. We firmly disagree that Owners should get the benefit of a 5% tolerance in these circumstances.

30. It should be noted that there is no authority for the proposition that "about", in the context of redelivery bunker disputes, equates to a tolerance of 5%. This reality was recognised by the Tribunal in *London Arbitration 15/13*,. We draw Charterers' attention to the following remarks made by the Tribunal in that reference:

    *"Any absolute acceptance of a shortfall of 5% across the board would lead to an unacceptable situation where charterers would try to save costs by redelivering with a 5% shortfall".*

31. The rationale behind giving any sort of tolerance, in respect of "about", is that it is not always possible for Charterers to determine how much bunkers the Vessel needs to be replenished with, in order to comply with their obligation to redeliver with about the same quantities as on delivery.

32. That is particularly the case where bunkering takes place several days prior to redelivery.

33. In the instant case, bunkering was the very last act performed by Charterers. As soon as the final bunker barge cast off, the Vessel was redelivered to Owners. Therefore, Charterers had no difficulty in assessing how much bunkering was required for them to comply with their CP obligations.

34. For the purpose of this message, Owners are prepared to concede that Charterers should be given a tolerance of 2%, as the charterers were given in *London Arbitration 15/13*. But this is strictly without prejudice to Owner's right to argue in arbitration that the tolerance given to Charterers should in fact be even lower.

35. Based on a 2% tolerance, Owner's claim for damages arising from Charterers' breach, in failing to redeliver with about the same quantities, is as follows:

    47.825 MT IFO * USD 650 = USD 31,086.25

    31,158 MT MGO * USD 900 = USD 28,042.20

    Total = USD 59,128.45

Page 5

**Underperformance Claim**

36. Charterers have made deduction in respect of an alleged underperformance claim. In support of this alleged claim, Charterers rely on a report from WRI.

37. WRI's report is none compliant with the CP performance warranties, for the simple reason that it includes in its assessment of good weather, periods during which the Vessel was experiences adverse currents. This is not permissible.

38. Owners are willing to discuss any valid claim for underperformance that Charterers may have. However, the WRI report in its current form is of no assistance to Charterers.

39. We suggest that Charterers obtain a revised report from WRI, that strictly applies the CP warranty and good weather criteria, and we can discuss the matter further if required.

40. For the time being, Charterer's claim for underperformance is rejected in its entirety.

**Demand**

41. We enclose with this letter, a slightly updated Final Hire Statement from Owners. As you will see, following the conclusion of the Charterparty, there is a balance of accounts due in Owners' favour, in the amount USD 115,694.91 (the "**Balance**").

42. We hereby demand that the Balance is settled within 7 days of the date of this letter.

43. Should Charterers fail to settle the balance within 7 days, Owners reserved all their rights, and will take all available steps to protect their position. Those steps may include the commencement of arbitration, without any further notice to Charterers, and the attachment of Charterers' assets, in order to seek security for their claims.

44. It is noted that, even on Charterer's FHS, there is a balance owing to Owners in the amount **USD 78,285.45** (the **"Admitted Balance"**). Charterers should note that if Owners are forced to commence arbitration, their first act in that arbitration will be to apply for an interim award in respect of the Admitted Balance, under the *Kostas Melas* jurisdiction.

45. We trust that these steps will not prove necessary, and that Charterers will confirm within 7-days that the Balance has been settled. Otherwise, all Owners' rights are hereby expressly reserved.

Yours faithfully,


**MFB Solicitors**